**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Wesley BUCEY, Defendant–Appellant.**

**No. 88–1912.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 11, 1989.

Decided June 8, 1989.

Rehearing and Rehearing En Banc Denied July 13, 1989.

---

Susan L. Satter, Chicago, Ill., for Wesley Bucey.

Anton Valukas, U.S. Atty., Chicago, Ill., David J. Stetler, Chief, Victoria J. Peters, and Howard M. Pearl, Deputy Chiefs, John S. Brennan, Asst. U.S. Atty., Criminal Receiving & Appellate Div., G. Roger Markley, Special Asst. U.S. Atty., Chicago, Ill., for U.S.

Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and GRANT, Senior District Judge.*

CUDAHY, Circuit Judge.

Defendant-appellant Wesley Bucey was convicted of multiple related offenses arising out of an elaborate money laundering scheme designed to ostensibly "legitimize" the source of illegally obtained cash and to evade taxes. Bucey's conviction was based on a twelve-count indictment charging him with conspiracy, 18 U.S.C. section 371; mail and wire fraud, 18 U.S.C. sections 1341, 1343; failure to file currency transac-

* Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

tion reports with the Internal Revenue Service ("IRS"), 31 U.S.C. sections 5313, 5322(b); causing false information to be provided to the IRS, 18 U.S.C. sections 2(b), 1001; and attempting to obstruct the administration of a grand jury, 18 U.S.C. section 1503. Bucey appeals his conviction on all counts. We affirm in part and reverse in part.

## I.

This is a tale of an illicit money laundering enterprise engineered by defendant Bucey and Boston Witt, a former Attorney General of New Mexico.[1] We shall chronicle the facts, keeping in mind that all evidence and permissible inferences must be taken in the light most favorable to the government. *See United States v. Gimbel,* 830 F.2d 621, 622 (7th Cir.1987).

Bucey and Witt orchestrated a scheme with dual objectives: money laundering and tax evasion. The money laundering aspect of the operation was designed to provide a method for converting cash from unlawful activities, such as narcotics trafficking, into ostensibly legitimate business income. To carry out this scheme, Bucey set up a tax-exempt organization called the "Huguenot National Church," which was the conduit through which money was laundered.[2] Bucey and Witt charged a commission for these services rendered through the "church."

Bucey and Witt devised two methods for achieving the secondary objective of their scheme, tax evasion. First, they planned to use the Huguenot Church as a facade for directing their clients' illegally obtained cash overseas to the bank accounts of shell corporations. The clients could then spend this money in connection with the "business" of the foreign corporations, thereby avoiding taxation by the United States government. Bucey and Witt also arranged a second tax evasion strategem for persons seeking an illegal tax deduction to purchase art work through Bucey at an established price but to report the purchase at an inflated price through false documentation. Bucey would then accept the property as a sham donation to the Huguenot Church, enabling the purchaser to take an inflated charitable tax deduction.

Bucey and Witt's machinations were unveiled by an extensive undercover investigation. Undercover police officers, John and Don Smith, posed as drug dealers interested in laundering narcotics proceeds. In October 1985, Witt met the Smiths and advised them of a money laundering device by which they could transfer their cash overseas to a shell corporation and avoid paying taxes. Witt also discussed another mode of laundering the Smiths' cash through channels that would generate income purportedly earned by the Smiths for services provided to the Huguenot Church. All transactions would be supported by bogus documentation.

Following the October 1985 meeting, Witt contacted Bucey in Chicago and the two discussed the feasibility of exchanging the Smiths' cash for cashier's checks using the Huguenot Church account. Witt informed Bucey that the Smiths' cash was from a dubious source. Tr. at 221. On November 4, 1985, Witt met the Smiths in Las Vegas and discussed in more detail the money laundering operation. Witt explained Bucey's role in handling the cash and controlling the church's account. Witt proposed that the Smiths launder an initial deposit through a transaction conducted within the United States. Witt and Bucey viewed this as a step preparatory to generating cash for subsequent overseas transactions. *See* Tr. at 228. Witt instructed the Smiths to take their money to Chicago where Bucey would exchange it (minus a commission) for cashier's checks. Fraudulent documentation would identify the cash-

---

**1.** Boston Witt pleaded guilty and was a cooperating witness for the government in this case.

**2.** The church was an entity operated out of Bucey's home and had no edifice of its own. Upon searching Bucey's home, government agents discovered a "Huguenot National Church" file. Among other items, the file contained several newspaper articles about money laundering, including one entitled "Getting Dirty Money Squeaky Clean." *See* Government's Brief at 5 n. 4; Government's Exhibits 10A and 23–48; Tr. 1165–66.

ier's checks as income from business activities carried out by the Smiths on behalf of the church.[3] An agreement was made to conduct an initial transaction involving $50,000 at Freedom Federal Savings and Loan ("Freedom Federal") in Chicago on January 6, 1986.

Witt and Bucey met the Smiths in Chicago on January 6 to carry out the laundering transaction at Freedom Federal. Prior to the transaction, Bucey and Witt received $8,000 as part of their 20% commission. Bucey and Don Smith then approached the teller, Smith counted the money, $42,000, and Bucey deposited it into the Huguenot Church account, informing the teller that the money was for medicine and supplies for Mexico earthquake victims. Bucey then drew a check on the church's account for $40,000 to pay for two cashier's checks that were given to the Smiths; $2,000 remained in the church account.[4] Bucey completed a Currency Transaction Report ("CTR") describing the cash deposit. On the CTR form, Bucey listed himself as the "individual conducting the transaction with the bank," and listed the Huguenot National Church as the "organization for whom this transaction was completed." *See* Appellant's App. at 58. Nowhere did he identify the Smiths as the source of the money.

As a result of the January 6 transaction, Bucey had converted $50,000 of the Smiths' purported drug proceeds into $40,000 in cashier's checks supported by false documentation legitimizing its source. While Bucey and Witt understood that the Smiths would be required to pay taxes on the $40,000, the remaining $10,000 of the Smiths' narcotics income would be unreported.

On January 23, 1986, Bucey and Witt arranged a similar transaction involving Dembitz, a third government agent posing as a drug-trafficking associate of the Smiths. The transaction was carried out at Freedom Federal on February 20, 1986. Bucey deposited $84,000 in the church account and completed a CTR again listing himself as the "individual conducting the transaction" and the Huguenot Church as the "organization for whom this transaction was completed." *See* Appellant's App. at 60. Bucey then drew three checks totaling $80,000 on the Huguenot Church account in exchange for three cashier's checks in the same amount, which were given to Dembitz. Afterwards, the transaction was similarly documented by false invoices.

This second transaction resulted in Bucey's converting $100,000 of purported drug income into $80,000 supported by documentation legitimizing its source. The remaining $20,000 of Dembitz' drug income was to go unreported.

On April 24, 1986, Dembitz introduced Bucey to a fourth undercover government agent, Ahern, who posed as an investor seeking to avoid taxes through illegal deductions. Bucey advised Ahern of an art donation scam in which Ahern would purchase art with a check for an inflated price and receive 80% back as a kickback in cash. He described how Ahern could then donate the art to Bucey's church and report a charitable deduction for the inflated amount of his cancelled check.[5] When Dembitz expressed concern about excluding Witt from the deal, Bucey responded reassuringly that he and Witt "are a team as far as that goes." Government's Brief

---

**3.** Witt and Bucey discussed the details of how the Smiths' money would be deposited in the church's bank account and portrayed as contributions to the church on behalf of earthquake disaster victims. Bucey was then to funnel the money back to the Smiths as a fee for services never rendered and provide the corresponding false documentation.

**4.** Later, Bucey described to the Smiths how the church insulated them from IRS detection. He explained that had the Smiths themselves simply brought in $40,000 and purchased cashier's checks for cash, the bank would be required to

report that the Smiths purchased the checks. By writing a check on the church's account to pay for the cashier's checks, however, Bucey explained that there would be no report identifying the Smiths. Government's Brief at 11; Government's Exhibit 4A, at 20–21.

**5.** Ahern would retain possession of the art work, which would display a plaque stating that it was "on loan from the Huguenot National Church." *See* Government's Brief at 20; Government's Exhibit 13A, at 90.

at 20; Government's Exhibit 8A, at 18. Bucey later discussed the art deal with Witt, who wanted to ensure that the transaction ran smoothly. Tr. at 764–65.

Witt was eventually arrested on charges involving cocaine trafficking. Thereafter, agent Dembitz notified Bucey by telephone that he had been served with a grand jury subpoena ordering him to produce documents relating to Bucey and the Huguenot Church. Bucey requested that Dembitz send him the subpoena. Bucey then advised Dembitz to rehearse his grand jury testimony with an attorney. Bucey instructed Dembitz that, "You will discuss with the attorney how you raised funds in dribs and drabs for the Huguenot Church and then went over—went over into Mexico and bought—bought goods for those earthquake victims with funds—you know, funds in Mexico, and that you got reimbursed—you brought in the money that you raised and got reimbursed for your out-of-pocket expenses by check from the Huguenot Church." Government's Brief at 22; Government's Exhibit 18A, at 4. In a later discussion, Bucey reiterated that Dembitz should adhere to the story that he had performed services on behalf of the church. *Id.* at 23; Tr. at 842.

Bucey's escapades led to a grand jury indictment on twelve counts: count 1—conspiracy; counts 2–5—mail fraud; counts 6–7—wire fraud; counts 8–9—failure to file CTRs in violation of 31 U.S.C. sections 5313 and 5322(b); counts 10–11—causing false information to be provided to the government in violation of 18 U.S.C. sections 2(b) and 1001; and count 12—attempt-ing to influence, obstruct or impede the administration of a grand jury.

A jury convicted Bucey on all twelve counts. He was sentenced to five years' imprisonment on each of counts 1–9, to run concurrently, and two years' imprisonment on each of counts 10 and 11, to run concurrently with each other, but consecutively to the sentences on counts 1–9. On count 12, he was placed on probation for five years and fined $600.00. Bucey has appealed on all counts.

## II.

### A. *Failure to File CTRs*

Counts 8 and 9 charge, respectively, that on January 6, 1986, and February 20, 1986, Bucey and Witt, while acting in their capacity as a "financial institution," received currency in excess of $10,000 and knowingly and intentionally failed to file the required CTRs with the IRS in violation of 31 U.S.C. sections 5313 and 5322(b).[6] It is undisputed that on both occasions Bucey completed CTRs upon depositing the currency at Freedom Federal, which the bank then properly filed with the IRS. But, irrespective of those bank filings, the government contends that Bucey himself had an independent legal duty to file CTRs when he received the currency from the third-party government agents. These charges are predicated on the theory that Bucey is a "financial institution." Whether an individual acting in Bucey's capacity can be charged as a "financial institution" under the currency reporting laws is a question of first impression in this circuit.[7] The

---

**6.** With respect to the violation of 31 U.S.C. section 5322(b), a penalty enhancement provision, the indictment alleges that the failure to file CTRs offense was part of a pattern of illegal activity involving currency transactions exceeding $100,000, and was committed while violating another law of the United States, 18 U.S.C. section 1001.

Section 5322(b) states in pertinent part:
A person willfully violating this subchapter or a regulation prescribed under this subchapter ... while violating another law of the United States or as part of a pattern of illegal activity involving transactions of more than $100,000 in a 12–month period, shall be fined not more than $500,000, imprisoned for not more than five years, or both.

**7.** As a preliminary matter, we reject the government's argument that, because Bucey's tendered jury instructions defining "financial institution" were given to the jury without objection, Bucey has failed to preserve this issue for appeal. In a pretrial motion to dismiss the indictment, Bucey initially raised the issue whether, as a matter of law, he could be considered a "financial institution" under the currency reporting laws or regulations promulgated under them. Because the court rejected this challenge to the government's definition of "financial institution," it would have been futile for Bucey to object to the jury instruction. "If the problem has been brought to the attention of the court, and the court has indicated in no uncertain terms what its views

sufficiency of the indictment under the currency reporting laws and regulations, of course, raises questions of law for our de novo review. *See United States v. Gimbel,* 830 F.2d 621 (7th Cir.1987); *United States v. Varbel,* 780 F.2d 758 (9th Cir. 1986).

To be valid, an indictment must allege acts which, if proven, would constitute an offense under the law that the defendant is charged with violating. If the indictment does not charge such a cognizable offense, of course, we must reverse any subsequent conviction based on that indictment. *Gimbel,* 830 F.2d at 624 (citing *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987)). Accordingly, we must determine whether the acts alleged in counts 8 and 9 establish a violation of the currency reporting laws by a "financial institution."

We begin by examining the plain meaning of the statutes and regulations. "[I]n determining the scope of a statute, one is to look first at its language. If the language is unambiguous, ... it is to be regarded as conclusive unless there is a clearly expressed legislative intent to the contrary." *Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 110, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983), *reh'g denied,* 461 U.S. 911, 103 S.Ct. 1887, 76 L.Ed.2d 815 (1983).

The Currency Transactions Reporting Act, 31 U.S.C. section 5313, and its implementing regulations provide specific rules designating who is responsible for filing

CTRs. *See California Bankers Ass'n v. Schultz,* 416 U.S. 21, 26, 94 S.Ct. 1494, 1500, 39 L.Ed.2d 812 (1974). Section 5313 authorizes the Secretary of the Treasury to require domestic financial institutions, and *any other participants that the Secretary may prescribe,* engaged in transactions for the payment, receipt or transfer of United States currency, to report this currency to the Secretary.[8] Pursuant to this authority, there are Treasury regulations directing financial institutions to "file a report of each deposit [or] withdrawal ... which involves a transaction of more than $10,000." 31 C.F.R. § 103.22(a) (1986).[9] In 1986, when the acts charged in the indictment occurred, a financial institution subject to the reporting requirements was defined in 31 C.F.R. section 103.11(e) as follows:

> *Financial institution.* Each *agency, branch,* or *office* within the United States of any person doing business in one or more of the capacities listed below:
>
> (1) A bank ...;
>
> (2) A broker or dealer in securities;
>
> (3) A person who engages as a business in dealing in or exchanging currency as, for example, a dealer in foreign exchange or a person engaged primarily in the cashing of checks ...;
>
> (4) A person who engages as a business in the issuing, selling, or redeeming of travelers' checks, money orders, or similar instruments ...;

Title 31 U.S.C. section 5312(a)(2) defines a "financial institution" to include banks, thrifts, brokers, currency exchangers, travel agents, and other such establishments.

are, to require an objection would exalt form over substance." *United States v. Pirovolos,* 844 F.2d 415, 424 n. 8 (7th Cir.1988).

**8.** Title 31 U.S.C. section 5313(a) states in relevant part:

> When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency ... in an amount ... prescribe[d] by regulation, the institution *and any other participant in the transaction the Secretary may prescribe* shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made. [emphasis supplied].

**9.** 31 C.F.R. section 103.22, as in effect during the relevant time period, provided in part:

> (a) Each financial institution shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000. Such reports shall be made on forms prescribed by the Secretary and all information called for in the forms shall be furnished.

(5) A licensed transmitter of funds, or other person engaged in the business of transmitting funds abroad for others;

(6) A [licensed] casino....[10]

*Id.* (emphasis supplied).

The indictment alleges that Bucey and Witt were persons acting as a "financial institution" by engaging as a business in dealing in currency and in transmitting funds abroad for others. Indictment ¶ 1(c) at 1–2. Bucey claims that the indictment is legally deficient and, alternatively, that the evidence established at trial on this count was insufficient to support his conviction.

■ There is little case authority directly establishing whether an individual acting in Bucey's capacity could be criminally prosecuted as a "financial institution" under the currency laws in effect at the time of the offense alleged here. Most cases involving money laundering operations have involved the separate issue whether an individual engaged in money laundering can be derivatively liable under 18 U.S.C. section 2(b)[11] for *causing* what is indubitably a "financial institution" to fail to file an accurate CTR as required by the currency reporting laws.

Yet these cases are replete with intimations that an individual such as Bucey could not be prosecuted as a "financial institution." For example, in *United States v. Gimbel,* 830 F.2d 621 (7th Cir.1987), this court noted the government's concession that Gimbel, a lawyer who allegedly structured currency transactions for his clients in order to launder proceeds from narcotics trafficking and to conceal income from the IRS, had no independent duty to file a CTR reflecting the structured nature of the transactions. *See id.* at 624 n. 2. Instead, the government sought, albeit unsuccessfully, to convict Gimbel under 18 U.S.C. sections 2(b) and 1001[12] for causing a bank to conceal information, namely, CTRs, from the IRS.[13]

Likewise, in *United States v. Mastronardo,* 849 F.2d 799 (3d Cir.1988), defendants who had engaged in a multimillion dollar bookmaking and money laundering operation were charged with structuring currency transactions to avoid having financial institutions file CTRs. The defendants themselves were not charged as a "financial institution"; rather, the government charged them on a derivative theory for violating 18 U.S.C. sections 2(b) and 1001. The Third Circuit stated:

**10.** In 1987, the regulations defining a financial institution were amended to provide in pertinent part:

*Financial institution.* Each agent, agency, branch, or office within the U.S. of any person doing business, whether or not on a regular basis or as an organized business concern, in one or more of the capacities listed below:

. . . . .

(3) A currency dealer or exchanger, including a person engaged in the business of a check casher; ...

. . . . .

(5) A licensed transmitter of funds, or other person engaged in the business of transmitting funds;....

*See* 52 Fed.Reg. No. 67, at 11436 (April 8, 1987). Of course, because this amendment was not in effect at the time Bucey committed the alleged violations, it is not controlling.

**11.** Title 18 U.S.C. section 2(b) establishes that a person who causes another to commit an offense against the United States is chargeable as a principal.

**12.** Title 18 U.S.C. section 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies,

conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**13.** In *Gimbel,* the defendant received funds from his clients in excess of $10,000 but then structured separate withdrawal and deposit transactions with the bank so that each transaction involved less than $10,000. Gimbel structured the transactions in this manner so that the bank would not be required to file CTRs under the currency reporting laws. The events in *Gimbel* arose before the Treasury Department promulgated new regulations requiring financial institutions to aggregate structured transactions of this sort. Because the bank had no duty, prior to these new regulations, to aggregate multiple deposits and withdrawals which exceeded $10,000 and to file the corresponding CTRs, this court concluded that Gimbel could not be liable for *causing* a financial institution to fail to disclose material facts on CTRs to the IRS. *See also United States v. Risk,* 843 F.2d 1059 (7th Cir.1988).

Although the statute authorizes the Secretary to draft regulations requiring "participants" in transactions to file CTRs, the Secretary did not do so. Rather, the Secretary enacted regulations which, by their explicit language place a duty to file CTRs only on financial institutions. The regulations do not even intimate that a bank customer might somehow be violating the law if he structures his transactions so as to avoid making a transaction in currency greater than $10,000.... "[T]he present ambiguity regarding coverage of the Reporting Act and its regulations has indeed been created by the government itself."

*Id.* at 804–05 (quoting *United States v. Varbel,* 780 F.2d 758, 762 (9th Cir.1986)). *See also United States v. Nersesian,* 824 F.2d 1294, 1311–12 (2d Cir.) (bank customer involved in money laundering scheme had no legal duty to file a CTR himself) (dicta), *cert. denied,* —— U.S. ——, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987); *United States v. Heyman,* 794 F.2d 788, 790–91 (2d Cir. 1986) (government conceded, and court stated in dicta, that defendant, a Merrill Lynch account executive who devised scheme to structure customers' transactions in amounts less than $10,000 in circumvention of the currency reporting laws, had no legal duty to file CTRs), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed. 2d 587 (1986); *United States v. Varbel,* 780 F.2d 758, 762 (9th Cir.1986) (defendants engaged in money laundering had no duty to report currency transactions to or through the bank); *United States v. Denemark,* 779 F.2d 1559, 1561 (11th Cir.1986) (dicta); *United States v. Shearson Lehman Bros., Inc.,* 650 F.Supp. 490, 495, 500 (E.D.Pa.1986) (dicta), *aff'd in part and rev'd in part sub nom. United States v. Mastronardo,* 849 F.2d 799 (3d Cir.1988); *United States v. Richter,* 610 F.Supp. 480, 487 n. 4 (N.D. Ill.1985) (dicta), *aff'd without op. sub nom. United States v. Mangovski,* 785 F.2d 312 (7th Cir.), and *aff'd without op. sub nom. United States v. Konstantinov,* 793 F.2d 1296 (7th Cir.),

*cert. denied,* 479 U.S. 855, 107 S.Ct. 191, 93 L.Ed.2d 124 (1986).

The only case in this circuit directly resolving this question is *United States v. Riky,* 669 F.Supp. 196 (N.D. Ill.1987). There, the defendant had engaged in a money laundering scheme in which he received commissions for assisting others in concealing the source of income from narcotics trafficking. Focusing on the opening language of 31 C.F.R. section 103.-11(e),[14] the court held that, because the defendant was not an "agency, branch, or office" of any person doing business in one of the subsequently listed capacities, he was not a "financial institution." A later amendment to the regulation, adding the term "agent" to the definition of "financial institution," indicated that the government had not previously believed that the CTR filing obligation applied to individuals. *Id.* at 200. Accordingly, the court dismissed the indictment. *Id. See also United States v. Gimbel,* 632 F.Supp. 713, 721 n. 10 (E.D. Wis.1984), *rev'd on other grounds,* 830 F.2d 621 (7th Cir.1987) (the "plain meaning of the term 'financial institution,' as it is defined by statute and regulation, would be strained to cover a person such as Gimbel," who had engaged in a money laundering scheme) (dicta).

The First Circuit took a similar tack in *United States v. Anzalone,* 766 F.2d 676 (1st Cir.1985). There, the defendant "structured" transactions with the bank so that each involved less than $10,000; hence, the bank did not file CTRs. The First Circuit reversed his conviction and dismissed the indictment, which charged him personally with failing to file CTRs in violation of 31 U.S.C. section 5313, with causing the bank to fail to file CTRs in violation of 18 U.S.C. section 2(b) and with causing the bank to conceal material facts from the IRS in violation of 18 U.S.C. sections 2(b) and 1001. *See id.* at 679–80. The court concluded that, since the currency regulations limited application of the reporting requirements to financial institutions *only,* the defendant had no indepen-

**14.** *See supra* at 1302.

dent duty to file CTRs. *Id.* at 681, 683.[15] *Cf. United States v. Robinson,* 832 F.2d 1165 (9th Cir.1987) (bank teller, who was acting as a private individual and was not charged with operating a currency exchange business, was not a financial institution within currency laws and, thus, had no duty to file CTRs).

However, several other circuits have disagreed. For example, in *United States v. Goldberg,* 756 F.2d 949 (2d Cir.), *cert. denied,* 472 U.S. 1009, 105 S.Ct. 2706, 86 L.Ed.2d 721 (1985), the Second Circuit held that three defendants engaged in money laundering, including two bank officers, constituted a "financial institution," namely, a partnership or joint venture engaged as a business in dealing in currency.[16] The court adverted to the legislative history of the Bank Secrecy Act, 31 U.S.C. section 5311 *et seq.,* which indicated a design to provide a sweeping law enforcement tool for locating large currency transfers of proceeds from unlawful transactions. *See id.* at 954–55 (citing H.R.Rep. No. 975, 91st Cong., 2d Sess. 11–12, *reprinted in* 1970 U.S.Code Cong. & Ad.News 4394, 4396–97). The court divined an intent to reach a vast range of criminal conduct and to grant the Secretary broad authority to impose reporting requirements. *Id.* at 954–55 (citing 116 Cong.Rec. 16957 (1970) (statement of Rep. Burton)). Relying on this legislative history, the court held that the defendants qualified as a "financial institution."

The Eighth, Ninth and Eleventh Circuits have also on occasion broadly construed the term "financial institution" in the money laundering context. In *United States v. Hernando Ospina,* 798 F.2d 1570 (11th Cir. 1986), the defendant, who provided a money laundering service in which he exchanged approximately $1.3 million for Colombian pesos for a total commission of $52,000, was deemed a "financial institution," namely, a "person who engages as a business in dealing in or exchanging currency." Likewise, in *United States v. Mouzin,* 785 F.2d 682 (9th Cir.), *cert. denied,* 479 U.S. 985, 107 S.Ct. 574, 93 L.Ed. 2d 577 (1986), the Ninth Circuit held that a defendant who participated in an extensive money laundering and cocaine conspiracy qualified as a "financial institution" by virtue of her role in transferring currency across the country and overseas in an ostensibly legitimate business venture. The *Mouzin* court focused on the language in 31 C.F.R. section 103.11, which relates the definition of a "financial institution" to a "person who engages as a business in dealing in or exchanging currency as, for example, a dealer in foreign exchange or a person engaged primarily in the cashing of checks" and a "person engaged in the business of transmitting funds abroad." *Id.* at 689. *See also United States v. Cuevas,* 847 F.2d 1417 (9th Cir.1988) (extensive money laundering operation with several international offices constitutes a "financial institution"), *cert. denied,* —— U.S. ——, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); *United States v. Dela Espriella,* 781 F.2d 1432 (9th Cir.1986) (defendant, a kingpin of an intricate money laundering operation who delivered cash in excess of $10,000 to his couriers, qualified as a "financial institution" possessing a duty to file CTRs). *But cf. United States v. Rob-*

---

**15.** In addition, the court held that the regulations did not impose a duty on the defendant to inform the bank of the structured nature of his transactions. The court explained:

> Although this court, like all other institutions of the United States, is supportive of the law enforcement goals of the government and society, we cannot engage in unprincipled interpretation of the law, lest we foment lawlessness instead of compliance. *Kolender v. Lawson,* 461 U.S. 352, 361, 103 S.Ct. 1855, 1860, 75 L.Ed.2d 903 (1983). This is particularly so when the confusion and uncertainty in this law has been caused by the government itself, and when the solution to that situation, namely eliminating any perceived

loop holes, lies completely within the government's control.

*Anzalone,* 766 F.2d at 682.

**16.** The court noted in dicta that even assuming that the indictment charged each defendant individually as a "financial institution," the defendants would be encompassed by the language of the regulations which specifically applied to "a person." Nevertheless, the court held that it need not decide that issue because, at the very least, the three defendants acted as a partnership and joint venture, an entity from which Congress sought to require CTRs. *See Goldberg,* 756 F.2d at 955.

*inson,* 832 F.2d 1165 (9th Cir.1987); *United States v. Varbel,* 780 F.2d 758 (9th Cir. 1986). The Eighth Circuit has reflected a similar perspective. *See United States v. Hawley,* 855 F.2d 595, 602 (8th Cir.1988) (husband and wife team engaged in "warehouse banking" services constitute "financial institution"; "currency dealers or exchangers who act as middlemen between individuals and commercial banks can appropriately be defined as 'financial institutions' under section 103.11(e)(3), and convicted for failing to [file CTRs]"), *cert. denied,* — U.S. —, 109 S.Ct. 1141, 103 L.Ed.2d 202 (1989).

Some of these cases may be factually distinguishable; but, more importantly, none attempts to make sense of the directly operative "agency, branch, or office" language, which controls the definition contained in section 103.11(e). This language (which has subsequently been expanded) requires that, in order to qualify as a "financial institution," the defendant must be an "agency, branch, or office" of a person acting in one of the listed capacities. This language, which was relied upon in *Riky,* 669 F.Supp. 196 (N.D. Ill.1987), is clearly inapplicable to an individual. Moreover, our opinion in *Gimbel* is presumably premised on the assumption that an individual cannot be charged as a "financial institution." *See* 830 F.2d at 624 n. 2.

We are, of course, cognizant of the purpose underlying the Currency Transactions Reporting Act: "Congress recognized the importance of reports of large and unusual currency transactions in ferreting out criminal activity and desired to strengthen the statutory basis for requiring such reports." *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 38, 94 S.Ct. 1494, 1506, 39 L.Ed.2d 812 (1974). Nonetheless, it is not the role of the judiciary to "strengthen" the basis for requiring CTRs beyond that expressly provided by statute and regulation.

> If the government wishes to impose a duty on customers, or "other participants in the transaction," to report [currency] transactions, let it require so in plain language. It should not attempt to impose such a duty by implication, expecting that the courts will stretch statutory construction past the breaking point to accommodate the government's interpretation.

*United States v. Anzalone,* 766 F.2d at 682.

It is clear from the language of 31 C.F.R. section 103.22 that only financial institutions as defined are required to file CTRs. Therefore, it would be improper for us to resort to the legislative history as a basis for applying the regulation to entities other than those specified in it. *Varbel,* 780 F.2d at 762.[17] Accordingly, we conclude that the terms of the statute and regulations in

---

**17.** In response to the apparent inefficacy of the Bank Secrecy Act as a basis for imposing criminal liability on individuals engaged in money laundering, Congress enacted the Money Laundering Control Act of 1986. *See* 18 U.S.C. §§ 1956, 1957; 31 U.S.C. § 5324. Among other things, the Money Laundering Act prohibits individual bank customers from structuring transactions to circumvent CTR filing requirements. *See* 31 U.S.C. § 5324. *See generally* Comment, *The Money Laundering Control Act of 1986: Tainted Money and the Criminal Defense Lawyer,* 19 Pac. L.J. 171 (1987).

It is also worth noting that, in the Internal Revenue Code, Congress has explicitly imposed an independent reporting burden on *individual persons* who receive in excess of $10,000. *See* 26 U.S.C. § 6050I (West Supp.1989). This section provides in pertinent part:

(a) Cash receipts of more than $10,000.00
—Any person—
(1) who is engaged in a trade or business, and

(2) who, in the course of such trade or business, receives more than $10,000 in cash in 1 transaction (or 2 or more related transactions),
shall make the return described in subsection (b) with respect to such transaction (or related transactions) at such time as the Secretary may by regulations prescribe.

This statute specifically excludes financial institutions subject to the reporting requirements of title 31. *See* 26 U.S.C. § 6050I(c)(1). Of course, this provision is inapplicable to the present case involving a conviction under 31 U.S.C. section 5313, a provision which does not by its express terms address the conduct of persons other than financial institutions. *See United States v. Denemark,* 779 F.2d 1559, 1563–64 (11th Cir.1986); *United States v. Perlmutter,* 656 F.Supp. 782, 788 (S.D.N.Y.1987), *aff'd without op.,* 835 F.2d 1430 (2d Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988).

existence at the relevant time did not impose a duty on Bucey to file CTRs.[18] To countenance the government's theory of prosecution imposing such a duty would deprive Bucey of his due process right to fair notice of the criminality of a failure to file. *See Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).[19] Hence, we conclude that the allegations contained in counts 8 and 9 of the indictment, charging Bucey as a "financial institution" with a duty to file CTRs, are legally insufficient to establish violations of 31 U.S.C. sections 5313 and 5322(b). Bucey's conviction on these counts must therefore be reversed and the indictment insofar as it relates to these counts dismissed.

### B. *Concealing and Falsifying Material Facts on CTRs*

Counts 10 and 11 of the indictment charge Bucey with causing the concealment and falsification of material facts within the jurisdiction of the IRS in violation of 18 U.S.C. sections 2(b) and 1001.[20] Under section 1001, concealment violations "relate to the nondisclosure of statements required by statute, government regulation or form." *United States v. Tobon–Builes,* 706 F.2d 1092, 1096 (11th Cir.1983) (citations omitted). During each deposit transaction at Freedom Federal on January 6, 1986, and February 20, 1986, Bucey completed the required CTR on Form 4789, which was prescribed by the Secretary of the Treasury. *See* 31 C.F.R. § 103.25(a). Part I of Form 4789 requests the identity of the "individual conducting the transaction with the financial institution," while Part II requests the identity of the "indi-

vidual or organization for whom this transaction was completed." *See* Appellant's App. at 58, 60.[21] Bucey listed himself as the individual conducting the transaction and Huguenot National Church as the individual or organization for whom the transaction was completed. *See id.* The indictment charges that, by completing the form in this manner, Bucey intentionally concealed the true identity of the individual who conducted the transaction and the individual for whom the transaction was completed. *See* Indictment ¶¶ 3, 4 at 25, ¶¶ 3, 4 at 26. In response to Bucey's motion to dismiss these counts of the indictment for failure to state an offense, the district court cursorily determined that the allegations of active concealment of material facts that were required to be disclosed sufficiently stated a criminal offense.

The government submits that, based upon the evidence established at trial, a jury could have rationally concluded that the individual who conducted the transaction in each instance was the undercover agent, not Bucey, and that, therefore, Bucey had lied in completing Form 4789. The government relies primarily on the evidence that the agent physically carried the money into the bank, assisted in counting it, and received cashier's checks as a result of the transaction. We do not think these facts are probative. While the agent may have carried the money into the bank, it was Bucey who was responsible for carrying out the money laundering operation, who received a commission for his services, who controlled the Huguenot Church account and who was solely autho-

---

**18.** At the very least, we think that the language contained in the statute, regulations and legislative history is "ambiguous, leaving us unable to define the ambit of the criminal statute[; therefore,] the Rule of Lenity requires that we strictly construe the statute in favor of the defendant." *United States v. Lowe,* 860 F.2d 1370, 1376 (7th Cir.1988) (citing *United States v. Turkette,* 452 U.S. 576, 587 n. 10, 101 S.Ct. 2524, 2531 n. 10, 69 L.Ed.2d 246 (1981)), *cert. denied,* —— U.S. ——, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989).

**19.** Conceptually, the government's theory is somewhat anomalous. Essentially, the argument is that Bucey was a walking "financial

institution" so that when he received the cash from the agents at Freedom Federal, a duty attached requiring him to file a CTR in addition to the one he would complete immediately upon depositing the money. We do not think the regulations contemplate such a scenario.

**20.** *See supra* notes 11–12.

**21.** This language resembles the language contained in 31 U.S.C. section 5313(a), which provides: "A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made."

rized to make the necessary deposits. Therefore, we do not think a rational juror could have found beyond a reasonable doubt that Bucey willfully concealed or falsified a material fact when he listed himself as the individual conducting the transaction with the bank.

■ A closer question is whether Part II of Form 4789 required Bucey to disclose that the agents were the "individual[s] or organization for whom this transaction was completed." In essence, the issue is whether Bucey had a duty to reveal the source of the funds involved in the transaction.

In *United States v. Gimbel*, 632 F.Supp. 713, 721 n. 10 (E.D. Wis.1984), *rev'd on other grounds*, 830 F.2d 621 (7th Cir.1987), the district court held that the law did not require the defendant, an attorney engaged in money laundering, to disclose on CTRs the real parties in interest in connection with currency transactions. In dismissing this count of the indictment, the court concluded:

> Under the plain meaning of the regulations implementing the Bank Secrecy Act, Gimbel and others similarly situated would not have notice that they must reveal the identities of the real parties in interest to domestic currency transactions made through their trust accounts.

*Id.* at 723.

Similarly, in *United States v. Murphy*, 809 F.2d 1427 (9th Cir.1987), the Ninth Circuit held that the law did not clearly impose a duty on the defendant to disclose the source of the funds on CTR Form 4789. In *Murphy*, the defendant was charged

with conspiring to conceal and falsify material facts within the jurisdiction of the IRS by "falsely identifying the source of the deposited funds as ATC, although he knew the money came from undercover IRS agents." *Id.* at 1429. The court noted that ATC had an account at the bank where the money was deposited, and that an ambiguity in the instructions on the CTR could reasonably lead a depositor to fill out the form as the defendant did in the challenged transaction.[22] The court concluded that the directions on Form 4789 "could easily lead noncriminal participants in CTR transactions to believe that they were required only to name the holder of the account." *Id.* at 1431. As the *Murphy* court reasoned:

> Due process requires that penal statutes define criminal offenses with sufficient clarity that an ordinary person can understand what conduct is prohibited. *Kolender v. Lawson*, 461 U.S. 352, 357 [103 S.Ct. 1855, 1858, 75 L.Ed.2d 903] (1983). Section 5313 and its regulations do not clearly require depositors to identify the source of their funds. Therefore, the imposition of criminal sanctions on these facts would violate due process. *Cf. Varbel*, 780 F.2d at 762.

*Murphy*, 809 F.2d at 1431.

We agree with the reasoning and result of the Ninth Circuit in *Murphy* and the district court in *Gimbel*. Bucey deposited cash into the Huguenot Church account and, accordingly, listed the church as the "organization for whom this transaction was completed." We do not think the language of the statute, regulations or Form

---

22. The ambiguity arose out of language contained in the explanatory instructions to Part II, which referred to "the identity ... of the individual or organization *for whose account* the transaction is being made." *Murphy*, 809 F.2d at 1430. The court reasoned that the emphasized phrase *could* mean "for whose bank account," in which case the defendant truthfully responded "ATC," the nominal account holder. *Id.* These instructions were not introduced into evidence in the case at bar. *See* Tr. at 524. Nevertheless, the regulation in effect at the time of Bucey's actions contained the same language as that included on the form in *Murphy*. In a section labeled "Identification required," title 31 C.F.R. section 103.27 provided in pertinent part:

> [B]efore effecting any transaction with respect to which a report is required the financial institution shall verify and record the name and address of the individual *presenting* a transaction, as well as record the identity, account number, and the social security or taxpayer identification number, if any, of any person or entity *for whose or which account* such transaction is to be effected. [emphasis supplied].

We think that the language contained in Part II was sufficiently ambiguous to preclude notice to a reasonable depositor of the duty to disclose the source of the funds.

4789 was sufficiently clear for an ordinary person to understand that listing the undercover agents was required. Thus, because neither Bucey nor the bank had a duty to report the source of the money in Part II of Form 4789, there was no concealment or falsification of material facts in violation of 18 U.S.C. sections 2(b) and 1001. Accordingly, Bucey's conviction for this offense must be reversed and counts 10 and 11 dismissed.

## C. *Mail and Wire Fraud Counts*

Bucey raises two principal objections in connection with the mail and wire fraud counts.[23] First, he contends that the indictment is legally insufficient to allege a violation of the mail and wire fraud statutes because it does not adequately charge loss of property by the government. Alternatively, he argues that, even if the indictment sufficiently alleges violations of the mail and wire fraud statutes, the government failed to prove at trial that the government in fact did or would have lost income tax revenue as a consequence of Bucey's actions.

In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court held that the mail fraud statute is limited to schemes "aimed at causing deprivations of money or property." *Id.*, 107 S.Ct. at 2881. Hence, the *McNally* Court determined that the citizen's intangible right to honest government is not a protectible property right for purposes of mail fraud. The Court has since made clear, however, that "property" may comprise both tangible and intangible property rights. *See Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (holding that confidential business information constitutes "prop-

erty" protected by the mail and wire fraud statutes). Thus, the fact that the government's interest in unpaid taxes is intangible is no definitive obstacle to a mail or wire fraud conviction. *See United States v. Porcelli*, 865 F.2d 1352, 1360 (2d Cir.1989). The determinative inquiry is whether Bucey's money laundering scheme defrauded the federal government of a property right, thereby injuring the government in its role as a "property-holder." *See McNally*, 107 S.Ct. at 2882 n. 9.

With respect to the mail fraud counts, the indictment alleges that Bucey "devised and intended to devise a scheme and artifice to defraud the United States of money and property, that is, income taxes." Indictment ¶ 2 at 8. Bucey argues that this allegation does not satisfy the *McNally* standard because the federal government does not possess a cognizable "property interest" in income taxes due and owing.

In *United States v. Gimbel*, 830 F.2d 621, 627 n. 3 (7th Cir.1987), this court specifically left open the question whether a scheme to deprive the federal government of tax dollars is cognizable under *McNally*. The indictment in *Gimbel* did not charge that the defendant's scheme deprived the Treasury Department of money or property. Instead, the indictment alleged that the scheme consisted of depriving the Treasury Department of CTRs and other "accurate and truthful information and data." The government had argued that because Gimbel's scheme concealed information from the Treasury Department which, if disclosed, might have resulted in the Department's assessing tax deficiencies, Gimbel in effect deprived the Treasury of tax revenues. *Gimbel*, 830 F.2d at 626. This court rejected the government's theory, relying on the principle of *McNally* that the

---

23. The mail fraud statute, 18 U.S.C. section 1341, states in pertinent part:
     Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do [uses the mails or causes them to be used,] shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Our analysis of Bucey's conviction under the mail fraud statute, counts 2 through 5, also applies to his conviction on counts 6 and 7 under the corollary wire fraud statute, 18 U.S.C. section 1343. *See United States v. Gimbel*, 830 F.2d 621, 627 (7th Cir.1987) (citing *United States v. Feldman*, 711 F.2d 758, 763 n. 1 (7th Cir.), cert. denied, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983)).

mail fraud statute does not proscribe schemes to defraud entities of intangible rights. Because the jury was not required to find that the scheme resulted in the government's being deprived of money or property, the court reversed Gimbel's mail fraud conviction. *Id.* Likewise, in *United States v. Eckhardt*, 843 F.2d 989, 996 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 106, 102 L.Ed.2d 81 (1988), this court concluded that an allegation that the defendant's scheme was devised "[t]o defraud the United States by impeding ... the functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of the revenue, to wit, income taxes" would not, in itself, satisfy *McNally.* However, the indictment in *Eckhardt* had alleged multiple objectives, one of which was "[t]o obtain money and property [from investors] by false and fraudulent representations and pretenses...." *Id.* Thus, this court concluded, "The failure of the indictment to allege an underlying scheme to defraud the *government* of money or property is not fatal because it does allege a scheme to defraud the *investors* of money or property." *Id.* at 997. Arguably, this language reflects the *Eckhardt* court's view that, had the indictment specifically alleged that the government was defrauded of money or property, it would have comported with the *McNally* standard.

In response to Bucey's motion to dismiss the mail and wire fraud counts of the indictment, the district court determined that the allegations sufficiently charged a cognizable loss of money or property. The district court relied on the general principle that the government has a property right in tax revenues on the date that they accrue. *See Manning v. Seeley Tube & Box Co.,* 338 U.S. 561, 566, 70 S.Ct. 386, 389, 94 L.Ed. 346 (1950) ("Congress intended the United States to have the use of money lawfully due when it became due."). Similarly, in *United States v. Doe,* 867 F.2d

986 (7th Cir.1989), we held that a scheme to deprive Cook County of its tax revenues satisfied the *McNally* money or property interest test. *See id.* at 989 ("Under Illinois law, Cook County has a property interest in its collected and uncollected tax revenues.").

Although no other circuit court has conclusively resolved this issue, the Fifth Circuit has stated in dicta that "[c]ertainly a scheme to defraud the United States of taxes would meet the 'money or property' requirement of *McNally...."  United States v. Herron,* 825 F.2d 50, 56 (5th Cir.1987). Moreover, the district court in *United States v. Regan,* 699 F.Supp. 36, 40 (S.D.N.Y.1988), expressly held that the government did indeed have a *McNally* property interest in income taxes due and owing. The *Regan* court reasoned:

> The alleged purpose of the [defendant's] transactions was to defraud the [U.S.] government of tax revenue. The defendants argue that this cannot be characterized as a scheme to defraud the government of property, because the government's property interest in tax revenue does not vest until a tax deficiency is declared. Whether the government had a vested property interest during the life of the scheme is irrelevant. If the alleged scheme had been brought to fruition, it would have fraudulently deprived the government of tax receipts. That was the alleged purpose of the scheme. Surely that putative monetary detriment satisfies the *McNally* requirement.

699 F.Supp. at 40.

■ The reasoning of *Regan* and *Doe* is sound and we affirm the determination of the district court that the allegation in the indictment charging Bucey with devising a scheme "to defraud the United States of money and property, that is, income taxes" satisfies the *McNally* "money or property" requirement.[24]

---

24. In *Gimbel,* we left open the issue whether a scheme to deprive the federal government of tax dollars is cognizable in light of footnote 4 of *McNally,* which states, "The Government concedes that it was error for the District Court to

include the instruction on tax fraud in the substantive mail fraud instruction ... but the effect of that error is not now at issue." 107 S.Ct. at 2878 n. 4. We conclude that footnote 4 of *McNally* does not foreclose a mail fraud convic-

■ Bucey's second objection to his conviction for mail and wire fraud is that there was insufficient proof at trial that the United States actually did lose or would have lost tax revenues. Obviously, since Bucey's tax-evading "clients" in this case were undercover government agents, the government was not *in fact* deprived of tax revenues. Nevertheless, since the mail fraud statute punishes the *scheme* to defraud, this court has reiterated on numerous occasions that the ultimate success of the fraud and the actual defrauding of a victim are not necessary prerequisites to a successful mail fraud prosecution. *See Moore v. United States*, 865 F.2d 149, 153 n. 1 (7th Cir.1989); *Ward v. United States*, 845 F.2d 1459, 1462 (7th Cir.1988); *United States v. Keane*, 522 F.2d 534, 545 (7th Cir.1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). Consequently, the fact that the government was not actually deprived of tax revenues does not warrant reversal of Bucey's conviction.

Bucey indicated on several occasions that the scheme was designed to "stick it back in Uncle Sam's ear" and to "screw the IRS." Moreover, the jury was specifically instructed that, in order to convict, it was required to find a scheme to defraud the government of money or property.[25] We think the evidence was sufficient in this case for the jury to find that Bucey and his partner, Witt, intended to defraud the government of money or property.

### D. *Conspiracy*

Title 18 U.S.C. section 371, includes two prongs: it is a crime (1) to "conspire ... to commit any offense against the United States, or [2] to defraud the United States, or any agency thereof in any manner or for any purpose." *Id.* Count 1 of the indictment charges Bucey both with conspiracy to defraud the United States and with conspiracy to commit substantive offenses against the United States.[26] On appeal,

---

tion based on a scheme to defraud the federal government of income taxes. In *McNally,* the district court had erroneously instructed the jury that, in order to convict for mail fraud, the jury had to find that the defendant impeded the IRS' collection of income taxes. This instruction was legally incorrect because the district court had previously dismissed those mail fraud counts alleging tax fraud objectives due to the government's failure to charge that the tax returns involved were fraudulent. Thus, footnote 4 is irrelevant to the issue at bar. *See McNally,* 107 S.Ct. at 2878 n. 2; *United States v. Gray,* 790 F.2d 1290, 1297–98 (6th Cir.1986), *rev'd sub nom. McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987); Brief of United States at 9–10 n. 9, *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987); Brief of Gray at 7 n. 7, *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987); *Cf. Doe,* 867 F.2d at 989.

**25.** In connection with the "money or property" element, the jury received the following instruction:

As to Counts 2 through 7 only, the money and property in question is the income taxes that would be due and owing from an amount of income of $24,000, an amount of income earned by Don and John Smith and James Dembitz in their undercover roles.

Tr. at 1331. Apparently, the $24,000 figure was the difference between the amount purportedly earned by the agents in their drug-trafficking affairs and the amount they could declare as income to the IRS evidenced by bogus docu-

mentation prepared by Bucey and Witt. Tr. at 1136.

**26.** Specifically, count 1 of the indictment charges Bucey with conspiracy

(A) to defraud the United States:

(i) by impairing, obstructing and defeating the lawful functions of the Department of Treasury:

(a) in the collection of accurate data and reports relating to currency transactions at financial institutions in excess of $10,000, for use in criminal, tax, and regulatory investigations and proceedings, and of the enforcement of those laws and regulations found in Title 31, U.S.C. section 5311 *et seq.,* and Title 31, C.F.R. section 103.11 *et seq....*;

(b) in the obtaining of accurate information and data for determining the sources and amounts of income; and

(c) in the determination, assessment and collection of revenue, that is, income taxes; and

(ii) by concealing the source of funds subject to forfeiture under the federal laws relating to narcotics;

(B) to willfully counsel and advise the preparation and presentation of federal income tax returns, which returns were to be false and fraudulent as to the material matters of the source and amount of income, in violation of U.S.C. section 7206(2); and

(C) to travel and cause travel in interstate commerce ... and [use the mails] with the intent to distribute the proceeds of an unlawful activity, and ... to perform acts of distri-

Bucey asserts that the conspiracy conviction must be set aside because none of the acts comprising the conspiracy constitutes a criminal offense. He marshals his arguments challenging each alleged unlawful objective and then concludes that the only conspiracy proven was a conspiracy to conceal the source of currency, which, he submits, is not criminal.

The indictment charges a multi-faceted conspiracy aimed at attaining six separate but related objectives:

to defraud the United States by-

(1) impairing the Treasury Department's collection of accurate CTRs and enforcement of the currency laws;

(2) impairing the Treasury's collection of information to determine the correct sources and amounts of income;

(3) impairing the Treasury's assessment and collection of income taxes; and

(4) concealing the source of funds subject to forfeiture under the federal narcotics laws; and to commit the substantive offenses of—

(5) willfully advising the preparation of false income tax returns; and

(6) facilitating and distributing the proceeds of a narcotics distribution.

■ It is a general tenet of conspiracy law that when an indictment alleges a conspiracy with multifarious objectives, a conviction will be sustained so long as the evidence is sufficient to show that the defendants agreed to accomplish at least one of the alleged objectives.[27] *See United*

States v. Soteras, 770 F.2d 641, 646 (7th Cir.1985) (citing *United States v. Alvarez*, 735 F.2d 461, 465–66 (11th Cir.1984); *United States v. Mackey*, 571 F.2d 376, 387 n. 14 (7th Cir.1978); *United States v. James*, 528 F.2d 999, 1014 (5th Cir.), *cert. denied*, 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976)).

■ Notwithstanding the absence of substantive currency law violations, Bucey's acts, when viewed as part of the overall illicit money laundering scheme, support a conviction for conspiracy to defraud the United States by impeding the lawful function of the Treasury Department as described in objectives (1) through (3).[28] In order to convict under the conspiracy to defraud clause of section 371, the government need not charge or prove that Bucey agreed to commit, or actually did commit a substantive offense. He merely "must have 'agreed to interfere with or obstruct one of [the government's] lawful functions by deceit, craft or trickery, or at least by means that are dishonest.'" *United States v. Richter*, 610 F.Supp. 480, 486 (N.D. Ill.1985) (Aspen, J.) (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)). "[A]cts which are in themselves legal lose their legal character when they become constituent elements of an unlawful scheme." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707, 82 S.Ct. 1404, 1415, 8 L.Ed.2d 777 (1962).

bution of said proceeds and facilitation of carrying on said unlawful activity, in violation of 18 U.S.C. section 1952(a)(1) and (3). Indictment ¶ 2 at 3–4.

**27.** In this connection, the court properly instructed the jury that, in order to convict Bucey of conspiracy, the jury had to find that Bucey conspired to commit at least one of the six alleged objectives. *See* Tr. at 1318. Because none of the objectives upon which the jury may have relied involves a legally invalid or unconstitutional basis for conviction, the general verdict form does not require reversal of Bucey's conspiracy conviction. *Contra Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957) (where a general verdict is supportable on one ground, but an alternative ground is invalid due to a statute of limitations bar, and it is impossible to tell which ground

the jury selected, the verdict must be set aside), *overruled on other grounds by Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Feela v. Israel*, 727 F.2d 151, 154 (7th Cir.1984) ("Where a verdict is general, and conviction under one of several alternate theories would be unconstitutional, the conviction must be set aside lest the verdict rest on an unconstitutional basis."); *Cramer v. Fahner*, 683 F.2d 1376, 1380 (7th Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 509 (1982); *United States v. Baranski*, 484 F.2d 556, 560–61 (7th Cir.1973). *Cf. United States v. Holguin*, 868 F.2d 201, 202–03 (7th Cir.1989).

**28.** Thus, under *Soteras*, we need not determine whether the conspiracy conviction may also be sustained on the basis of objectives (4) through (6).

Although Bucey's failure to file CTRs and failure to disclose the source of currency on Form 4789 are not unlawful acts, these acts "lost their lawful character when considered as part of a scheme to intentionally deprive the government of material information it would otherwise receive." *Richter*, 610 F.Supp. at 487. Quite apart from the underlying substantive offenses, Bucey is liable for agreeing with Witt to obstruct by deceit, craft or trickery the lawful function of the Treasury in collecting accurate CTRs (objective 1). *See Richter*, 610 F.Supp. at 486; *United States v. Nersesian*, 824 F.2d 1294, 1313 (2d Cir. 1987).[29] In addition, the evidence sufficiently establishes that the Bucey–Witt confederacy aspired to impede the function of the Treasury in obtaining information concerning the sources and amounts of income (objective 2), and in assessing and collecting income taxes (objective 3). Bucey informed the agents that by using the Huguenot Church account as a conduit for the cash-for-cashier's-checks transactions, the identity of the agents would not be disclosed on CTRs filed by the bank with the IRS and, thus, their identity and drug income would be insulated from government detection. Government's Brief at 11; Government's Exhibit 4A, at 20–21. Bucey and Witt also agreed to provide bogus documentation to prevent the IRS from trac-

ing the illicit source and amount of the agent's income. Moreover, Bucey expressed on several occasions their plot to "stick it back in Uncle Sam's ear" and "screw the IRS." *See* Government's Brief at 19; Tr. at 623. Considering the evidence in the light most favorable to the government, we think this overall scheme to circumvent the currency reporting laws and to prevent the IRS from collecting accurate data, reports and income taxes supports a conspiracy conviction regardless of the absence of substantive currency law violations. *Cf. United States v. Montalvo*, 820 F.2d 686, 690 (5th Cir.1987).[30]

### E. *Obstructing the Grand Jury*

Count 12 of the indictment charges Bucey with violating 18 U.S.C. section 1503 [31] on the grounds that Bucey "well knowing of the existence of said federal grand jury investigation did corruptly endeavor to influence, obstruct and impede the due administration of justice by advising, counseling and encouraging a person known to him as 'James O'Brien' to give false and misleading testimony when appearing before said grand jury." Indictment ¶ 3 at 27. Bucey's challenge is two-fold: (1) the government failed to prove that he had the requisite corrupt intent to impede a grand jury investigation; and (2) his actions were incapable of interfering with the adminis-

---

**29.** *Contra United States v. Murphy*, 809 F.2d 1427, 1432 (9th Cir.1987) (once court finds no violation of the currency laws, conspiracy to defraud IRS charge must also fail if it rests solely on the alleged violations of the currency laws); *United States v. Mastronardo*, 849 F.2d 799, 803–05 (3d Cir.1988).

**30.** Although at the time the acts arose in this case money laundering in itself was not a substantive criminal offense, courts have held that agreements to engage in such money laundering schemes may constitute criminal conspiracy under section 371. *See United States v. Jerkins*, 871 F.2d 598, 603–04, (6th Cir.1989); *United States v. Browning*, 723 F.2d 1544 (11th Cir. 1984) (laundering scheme aimed in part at thwarting IRS' identification of revenue and collection of taxes subject to criminal conspiracy conviction); *United States v. Enstam*, 622 F.2d 857 (5th Cir.1980) (defendants with intent to use the laundering scheme to obstruct the IRS' tax collecting function can be prosecuted for criminal conspiracy), *cert. denied*, 450 U.S. 912, 101

S.Ct. 1351, 67 L.Ed.2d 336 *cert. denied*, 451 U.S. 907, 101 S.Ct. 1974, 68 L.Ed.2d 294 (1981); *United States v. Richter*, 610 F.Supp. 480, 485–87 (N.D. Ill.1985).

After the conduct in this case arose, Congress enacted legislation making money laundering a substantive crime in the "Money Laundering Control Act of 1986," which is part of the Anti–Drug Abuse Act of 1986. *See* Pub.L. 99–570, 100 Stat. 3207 (Oct. 27, 1986) (codified at 18 U.S.C. §§ 1956, 1957; 31 U.S.C. § 5324).

**31.** Title 18 U.S.C. section 1503 provides in relevant part:

Whoever corruptly or by threats of force, or by any threatening letter or communication, endeavors to influence, intimidate or impede any grand or petit juror … or corruptly or by threats of force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

tration of justice since the putative grand jury "witness" was a fictional character.

■ To establish a violation of section 1503, the government must demonstrate that the "defendant knew of the pending judicial proceeding and specifically intended to impede its administration." *United States v. Guzzino*, 810 F.2d 687, 696 (7th Cir.) (citation omitted), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1957, 95 L.Ed.2d 529 (1987). Section 1503 is violated when a defendant interferes with the due administration of justice by tampering with a witness. *See United States v. Rovetuso*, 768 F.2d 809, 824 (7th Cir.1985), *cert. denied*, 474 U.S. 1076, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986), *cert. denied*, 476 U.S. 1106, 106 S.Ct. 1951, 90 L.Ed.2d 360 (1986). We do not think the fact that O'Brien (agent Dembitz' pseudonym) was a "fictional" grand jury witness precludes an obstruction of justice conviction. The statute proscribes the *endeavor* to influence or obstruct the administration of justice; thus, "the impossibility of accomplishing the goal of an obstruction of justice does not prevent a prosecution for the endeavor to accomplish the goal." *United States v. Brimberry*, 744 F.2d 580, 583 (7th Cir.1984) (citing *Osborn v. United States*, 385 U.S. 323, 333, 87 S.Ct. 429, 435, 17 L.Ed.2d 394 (1966) (where defendant Osborn allegedly employed informer to contact prospective juror, fact that informer never intended to carry out scheme did not preclude defendant's conviction for endeavoring to bribe juror)). *See also United States v. Rosner*, 485 F.2d 1213, 1228 (2d Cir.1973), *cert. denied*, 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed. 2d 672 (1974). Thus, Dembitz' fictitious identity as a grand jury witness does not exonerate Bucey from his "endeavor" to influence the proper administration of the grand jury.

■ In addition, viewing the evidence in the light most favorable to the government, we think it was sufficient for the jury to conclude that Bucey possessed the requisite corrupt intent to influence the administration of justice. This court elucidated the requisite intent element for obstruction of justice offenses in *United States v. Machi*, 811 F.2d 991 (7th Cir. 1987), and aligned itself with the Fourth Circuit:

> In our view, the defendant need only have had knowledge or notice that success in his fraud would have likely have [sic] resulted in an obstruction of justice. Notice is provided by the reasonable foreseeability of the natural and probable consequences of one's acts.

*Id.* at 998 (quoting *United States v. Neiswender*, 590 F.2d 1269, 1273 (4th Cir.1979)).

Bucey, who had been apprised of the ongoing grand jury investigation and of the subpoena purportedly issued to Dembitz, counseled Dembitz on how to role-play his grand jury testimony with his attorney and instructed Dembitz to provide false and misleading testimony to the grand jury. We think a jury could readily infer that Bucey had knowledge or notice that the success of his fraudulent endeavor would likely influence the just administration of the grand jury proceedings. *See United States v. Shannon*, 836 F.2d 1125 (8th Cir.) (sustaining obstruction of justice conviction based upon defendant's advice to former bank teller, who was prospective grand jury witness, that it would be "in her best interest" to forget about any large currency transactions which she had processed), *cert. denied*, —— U.S. ——, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988).

### F. *Prejudicial Reference to Drugs*

■ The final issue in Bucey's barrage of challenges on appeal is whether the references to narcotics trafficking during the course of the trial were prejudicial to the defendant. In a pretrial motion, Bucey moved that the district court strike as surplusage all references to drug dealing in the indictment and bar all evidence pertaining to drug dealing at trial. Bucey contends that the district court's denial of that motion was in error and that, because there was no evidence that he had direct knowledge that the undercover agents were posing as drug dealers, admission of these references was unduly prejudicial. Because we agree fully with the district court's disposition of this issue, we do not

think the court abused its discretion in denying Bucey's motion.

This court has stated that "evidence of other crimes may be presented when they are so blended or connected with the one on trial that proof of one incidently involves the other or explains the circumstances thereof or tends logically to prove any element of the crime charged." *United States v. Dorn,* 561 F.2d 1252, 1258 (7th Cir.1977). *See also United States v. Moreno–Nunez,* 595 F.2d 1186, 1188 (9th Cir. 1979); *United States v. Wilson,* 578 F.2d 67, 72 (5th Cir.1978). As the court below acknowledged, evidence of other acts may be admissible if it would assist the jury in understanding the factors surrounding the crime at issue and if the absence of evidence concerning the other acts would leave a "chronological and conceptual void" in the story. *See United States v. Hattaway,* 740 F.2d 1419, 1425 (7th Cir.), *cert. denied,* 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984), *cert. denied,* 469 U.S. 1028, 105 S.Ct. 448, 83 L.Ed.2d 373 (1984). In the instant case, the references to narcotics trafficking in both the indictment and at trial served to explain the purpose of and circumstances surrounding the money laundering scheme. We do not think the risk of unfair prejudice arising from this evidence substantially outweighed its probative value.

### III.

Accordingly, we reverse Bucey's conviction on counts 8–11 for violations of the currency reporting laws and dismiss the indictment on these counts. In addition, we affirm Bucey's conviction for conspiracy, mail and wire fraud and obstruction of justice, and, in accordance with our usual practice, we direct that he be resentenced. *See United States v. Holzer,* 840 F.2d 1343, 1352 (7th Cir.1988) (citing *United States v. Manzella,* 791 F.2d 1263, 1270 (7th Cir. 1986)).

AFFIRMED IN PART, REVERSED IN PART AND REMANDED WITH DIRECTIONS.