UNITED STATES of America,
Plaintiff-Appellant,

v.

Christopher P. MURPHY,
Defendant-Appellee.

No. 86–3031.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 3, 1986.

Decided Feb. 10, 1987.

---

Charles L. Stuckey, Asst. U.S. Atty., Portland, Or., for plaintiff-appellant.

Jeffrey R. Chanin, San Francisco, Cal., and Ron Hoevet, Portland, Or., for defendant-appellee.

Before WRIGHT, GOODWIN and NELSON, Circuit Judges.

GOODWIN, Circuit Judge:

The United States of America appeals from an order of the district court dismissing an indictment charging defendant Murphy with (1) conspiring to defraud the Internal Revenue Service ("IRS"), and (2) conspiring to conceal and falsify material facts within the jurisdiction of the IRS. We affirm.

The indictment alleges that in 1985, Whitehead and James, two undercover IRS agents, approached Murphy, Ronald Olson and Robert Gottier, and asked them to launder $4 million in United States currency. Murphy and his confederates agreed to deposit the money in a United States bank in such a manner as to conceal the true source and ownership of the money from the United States Department of the Treasury.

To further their plan, Gottier set up the Anteliz Trust Corporation ("ATC") in the Northern Mariana Islands. ATC did little or no business and had few or no assets. It did, however, issue a $4 million stock offering, which Murphy and Olson bought with money provided by agents Whitehead and James. The indictment alleges that defendants completed the stock transaction for the sole purpose of creating the false appearance that the $4 million had come from investors.

Later, Olson opened a bank account in ATC's name in Las Vegas, Nevada. He deposited $200,000 into the account. He completed a currency transaction report ("CTR") describing the deposit as required by 31 U.S.C. § 5313(a).[1] The report stated that the deposit had been made for ATC's account. Olson next directed the transfer of the deposited funds to a bank account in Manila, Republic of Philippines. Before any further transactions were completed, IRS agents arrested Olson, Murphy and Gottier.

The indictment charged the three with (1) conspiring to conceal and falsify material facts within the jurisdiction of the Internal Revenue Service in violation of 18 U.S.C. §§ 1001 and 2, and (2) conspiring to defraud the IRS in its collection of data in violation of 18 U.S.C. § 371. Murphy, an alleged co-conspirator of Olson and Gottier, immediately moved for dismissal, arguing that the facts alleged did not charge an offense. The district court initially denied the motion. It ruled that an agreement to conceal from the Treasury Department the true source and ownership of currency could constitute a conspiracy to defraud the United States.

However, following this court's decision in *United States v. Varbel,* 780 F.2d 758 (9th Cir.1986), the district court reconsidered the question and concluded that the indictment dismissed in *Varbel* was indistinguishable in material facts from the pending indictment. The court dismissed the indictment against Murphy, and the government appealed under 18 U.S.C. § 3731.

The indictment alleges that Murphy conspired with Olson and Gottier to provide false information on a CTR filed with the Secretary of the Treasury, in violation of 18 U.S.C. §§ 1001[2] and 2(b)[3]. The indictment specifically states that Murphy's alleged co-conspirator, Olson, falsely identified the source of the deposited funds as ATC, although he knew the money came from the undercover IRS agents.

Murphy argues that Olson truthfully completed the CTR form, and had no duty to report the source of the funds under the Currency Reporting Act (the Act). We agree with Murphy.

Title 31 U.S.C. § 5313(a) authorizes the Secretary of the Treasury to issue regulations requiring domestic financial institutions, and other participants in specified currency transactions, to file CTRs describing the transaction. The regulations imple-

---

1. Title 31 U.S.C. § 5313(a) provides:

 When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made.

2. 18 U.S.C. § 1001 provides:

 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

3. 18 U.S.C. § 2(b) provides:

 Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

menting section 5313 require financial institutions to file CTRs when they participate in transactions involving currency in excess of $10,000. 31 C.F.R. § 103.22(a) (1984). Reports are filed on Form 4789, which is provided by the Secretary.

■ The reporting act is not self-executing; it can impose no reporting duties until implementing regulations have been promulgated. *California Bankers Ass'n v. Schultz,* 416 U.S. 21, 26, 94 S.Ct. 1494, 1500, 39 L.Ed.2d 812 (1974). An individual cannot be prosecuted for violating the Act unless he violates an implementing regulation. *Id.; United States v. Reinis,* 794 F.2d 506, 508 (9th Cir.1986).

Thus, Form 4789 rather than section 5313 imposes affirmative duties of disclosure with regard to currency transactions.[4] We must decide whether Form 4789 required Olson to disclose that he obtained the $200,000 from IRS agents Whitehead and James. If so, then the indictment properly charged Murphy with conspiracy to falsify or conceal information within the jurisdiction of the IRS, and with conspiring to cause the bank to violate section 5313.

■ After carefully reviewing Form 4789, we hold that it does not clearly impose a duty to disclose the persons who delivered to him the deposited currency (the IRS agents). The crucial section of Form 4789, Part II, calls for the identity of the "[i]ndividual or organization for whom this transaction was completed." The government contends that this language required Olson to name the source of the funds.

Taken alone, Part II may ask for the source of funds. However, the head of the form carries explanatory instructions which create an ambiguity with regard to Part II. They refer to "the identity ... of the individual or organization *for whose account* the transaction is being made" (emphasis added).[5] Conversationally, "for whose account" has a double meaning. First, as the government proposes, it could mean "on whose behalf." If so, then Olson was required to name the IRS agents who gave him the money, as he was depositing it as a service to them. However, the phrase used in a bank transaction could also mean "for whose bank account," thus asking for the identity of the account holder. Under the second possible interpretation, Olson truthfully responded "ATC," because ATC was the nominal account holder.

The government contends that the Act itself plainly requires a depositor to identify the source of funds. Section 5313(a) provides:

A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made.

This contention ignores the principles of *California Bankers* and *Reinis.* These cases hold that the Act does not by itself impose affirmative duties on depositors, and that an individual may be prosecuted only for violations of the Act's implementing regulations. Expecting Olson to refer to the statutory language to "clarify" his duties as to Form 4789 is tantamount to holding him (and his co-conspirator Mur-

---

**4.** Murphy contends that Form 4789 is ineffective as a regulation because it was not promulgated according to the notice and comment procedures of the Administrative Procedure Act, 5 U.S.C. § 553, citing our opinion in *Reinis.* However, Murphy reads our language in *Reinis* too broadly. The case and its cited authority, *United States v. Richter,* 610 F.Supp. 480, 489 and n. 14 (N.D.Ill.1985), show only that the 1980 amendment to Form 4789 was not properly promulgated. That amendment imposed a duty upon banks to report multiple currency transactions by one individual amounting to more than

$10,000 in a single day. The amendment was at issue in both *Reinis* and *Richter,* but does not apply here.

**5.** This language appears to come from 31 C.F.R. § 103.26 (1984), which requires the reporting bank to

verify and record the name and address of the individual presenting a transaction ... [and] identify, ... any person or entity for whose or which account such transaction is to be effected.

phy) criminally liable under the Act for failure to disclose something which no regulation requires be disclosed.

Although the Secretary could have incorporated the language of the Act into Form 4789, and thereby directly asked for the identity of the person on whose behalf the transaction was being made, he chose not to do so. Instead, the form creates confusion by providing conflicting directions. These directions could easily lead noncriminal participants in CTR transactions to believe that they were required only to name the holder of the account.

 Due process requires that penal statutes define criminal offenses with sufficient clarity that an ordinary person can understand what conduct is prohibited. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). Section 5313 and its regulations do not clearly require depositors to identify the source of their funds. Therefore, the imposition of criminal sanctions on these facts would violate due process. *Cf. Varbel*, 780 F.2d at 762.

Because Murphy's co-conspirator had no duty to report the source of the money, it follows that there can be no concealment or conspiracy to conceal in violation of 18 U.S.C. § 1001. *See United States v. Dela Espriella*, 781 F.2d 1432, 1435 (9th Cir. 1986).

### Conspiracy to Defraud the United States

The indictment also charges Murphy with activities violating the second clause of 18 U.S.C. § 371.[6] This clause makes it a crime to defraud the United States. The indictment alleges that Murphy and his confederates conspired "to defraud the United States by impeding, impairing, obstructing, and defeating the lawful governmental functions of the United States Treasury Department and its agencies, includ-

ing the Internal Revenue Service, in the collection of data and reports of currency transactions in excess of $10,000 as required by [31 U.S.C. § 5313 and 31 C.F.R. § 103.11 et seq.]." The district court held that *Varbel* required dismissal of the charge.

In *Varbel*, defendants were charged with laundering money derived from drug trafficking. The operation allegedly involved deposits of large amounts of currency in United States banks. In order to prevent the banks from filing CTRs for the deposits, defendants engaged in multiple currency transactions of less than $10,000 each. The government charged them with various crimes, including conspiracy to defraud the United States by concealing from the IRS the structured nature of their transactions. On appeal, this court dismissed the indictments. We held that the regulations implementing the Act do not require individuals to inform either their banks or the IRS that they are engaging in multiple but related transactions in order to avoid the CTR filing requirement. Although the relevant statute authorized the Secretary to impose such a duty, his implementing regulations did not do so. Therefore, we held that there was no duty to disclose, and concluded that in the absence of such a duty there could be no conspiracy to defraud the United States. *Varbel*, 780 F.2d at 762.

 The government contends that *Varbel* is distinguishable from this case because the *Varbel* defendants never had a duty to file a CTR, while here defendants had such a duty (the transaction involved more than $10,000) and did file a CTR. We are not persuaded. Although the facts in *Varbel* are different, the principle is the same. Murphy and his co-defendants had no duty to disclose the source of the deposited funds. Where the regulations implementing the Act do not impose a duty to

---

**6.** Title 18 U.S.C. § 371 provides:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose,

and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

disclose information, failure to disclose is not conspiracy to defraud the government. *See id.; Dela Espriella,* 781 F.2d at 1435.

The government next argues that even if Olson's answers on the CTR cannot support the section 371 charge, the entire money-laundering scheme amounts to a scheme to defraud the IRS. It refers to our opinion in *United States v. Moran,* 759 F.2d 777 (9th Cir.1985), *cert. denied,* ── U.S. ──, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986), in which we found a defendant guilty of conspiracy to defraud the IRS. We did so in part because he helped launder illegal money by creating a web of foreign and domestic corporations and bank accounts in order to make it as confusing as possible for the IRS to unravel the case. *Moran,* 759 F.2d at 785. The government contends that ATC was part of a similar web spun by Murphy and his confederates.

 The intent here may, indeed, have been evil, but the conduct had not yet been denounced as crime. The indictment does not allege a conspiracy to defraud premised upon the defendants' entire laundering operations. It is far more narrowly drawn, stating that defendants conspired to defraud the United States *by impeding the IRS in its collection of information with regard to currency transactions.* In other words, the conspiracy to defraud charge rests solely on the alleged falsehoods in the CTR Olson filed. We have already noted that Olson truthfully completed the CTR. Therefore, the indictment before us does not properly allege a conspiracy to defraud. *See Dela Espriella,* 781 F.2d at 1435.

 Second, even if the indictment encompassed the defendants' total money-laundering activities, it would still fail to allege a crime under 18 U.S.C. § 371. Money laundering may be socially destructive, but it is not a crime. *Id.* at 1436. Illegal acts in a money-laundering scheme can be crimes. We upheld the *Moran* defendant's conviction in part because he advised his co-participants in the laundering scheme to report only a small fraction of their illegal profits on their income tax returns. That is a classic case of conspir-

ing to defraud the United States. *See* P. Marcus, *Prosecution and Defense of Criminal Conspiracy Cases* § 9.02[2] (1986). The indictment against Murphy, by contrast, alleges no scheme to deprive the government of tax revenue. It alleges only that ATC did little or no business, had few or no assets, and issued a stock offering so that defendants could launder money. None of these activities had, at the time, been proscribed by criminal statute.

Affirmed.