UNITED STATES of America,
Plaintiff–Appellee,

v.

Lonnie SCHMIDT, Defendant–Appellant.

No. 90–10473.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 15, 1991.

Decided Oct. 15, 1991.

**364**

William A. Cohan and Jennifer A. Greene, Cohan & Greene, Encinitas, Cal., for defendant-appellant.

Daniel S. Linhardt, Asst. U.S. Atty., Sacramento, Cal., for plaintiff-appellee.

Before CHAMBERS, Senior Circuit Judge, SNEED, Circuit Judge, and KELLEHER, District Judge.*

KELLEHER, District Judge:

## I. Factual and Procedural Background

Internal Revenue Special Agent Richard Carl was contacted in August 1985 by Internal Revenue Agent Mulholland to investigate appellant Lonnie Schmidt. Carl posed as a Northern California representative in charge of collections for an organized crime gambling interest from Las Vegas. Carl and the Internal Revenue Service had learned that the appellant, along with Herbert Bates, had failed to file Currency Transaction Reports (CTRs).

Agents Carl and Mulholland, in their undercover roles, became acquainted with Dean Salisbury and Joe Gorman. These individuals introduced the agents to the appellant and Bates.

On August 10, 1985, agents Carl and Mulholland, along with Salisbury and Gorman, had an introductory meeting with the appellant and Bates to learn about their operation. The appellant claimed that he was the representative of First Surety Bank, Ltd. (FSBL), a bank duly licensed by the government of the Marshall Islands. The appellant also stated that, as a foreign bank, any transaction that he handled for Carl and Mulholland would not be within the reporting requirements.

The appellant and Bates explained to the agents that they were outside the reporting requirements because they handled FSBL through their management company, International Commercial Business Management (ICBM). Bates claimed that, even though the Bank's funds were within the United States, legally the Bank was outside the country. The appellant explained that he and Bates did not have to conform to the reporting requirements for their transfers of cash through domestic banks because these transactions were "bank-to-bank" transactions outside the purview of the reporting requirements.[1]

One of the agents asked the appellant if it mattered from where the funds came. The appellant answered that it did not. Salisbury then assured the appellant and Bates that the funds came from a legal source. The appellant then suggested dif-

---

* The Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of California, sitting by designation.

1. However, the government contends that the appellant, prior to meeting with the agents, had been told by at least one bank that CTRs would be filed on transactions done through his FSBL account. Furthermore, the manager of Bank of America told the appellant that he personally should be filing CTRs for FSBL customers.

ferent ways in which CTRs could be avoided, one of which was to keep all the transactions under $10,000 by going to different banks in Sacramento and, if necessary, in the Reno/South Lake Tahoe area.

The appellant informed the agents that his commission would be due at the time the transactions were completed. He then informed the agents that only he and Bates were involved in the transaction. Before the meeting ended, the appellant asked how he could get in touch with Carl since he did not have, and might not ever get, Carl's last name.[2]

Carl next met with the appellant on August 13, 1985. Carl was now dealing with only the appellant because Carl had asked that Bates not be present at any further meetings. At this meeting, Carl told the appellant that he had $25,000 which he wished to exchange for a cashier's check. The appellant asked if it was possible for Carl to break the check down into more than one check because he wanted to get around filing a CTR.

The appellant explained how he would convert the cash into cashier's checks. He said that he had opened a new account with a bank and used several banks for converting cash into cashier's checks. Carl then gave the appellant $25,000 in United States currency which the appellant converted into two cashier's checks, one for $9,000 and one for $16,000.

On August 15, 1985, Carl again met with the appellant and converted $27,000 into wire transfers. The appellant guaranteed Carl that no CTRs would be generated as a result of these transfers because these were "bank-to-bank" transfers.

On August 22, 1985, Carl and the appellant met and decided to dismiss Salisbury and Gorman from any further transactions.

On September 3, 1985, Carl gave the appellant $100,000 in currency in exchange for cashier's checks. Carl stated that this money was associated with crime figures.

Carl raised the prospect of handling tainted money from other individuals. The appellant was amenable to the arrangement as long as a proper commission could be worked out.

On September 25, 1985, Carl met with the appellant to convert an additional $25,000 into cashier's checks and to discuss further money laundering for an individual whom he had identified in an earlier conversation as a "dope dealer." The appellant then discussed some of the services he could provide for the dealer. During the course of the meeting, Carl stated that he could be arrested for the operations in which he was involved. The appellant stated that he understood this. Later in the conversation, the appellant stated that he could act as a courier between the Cayman Islands and the United States for Carl's associates.

The last conversation between Carl and the appellant occurred on October 15, 1985. The two discussed the services the appellant would be willing to provide for Carl's supposed drug dealing friends. They discussed how the appellant would launder the money and how much commission he would take. Carl then gave the appellant $23,000 which the appellant converted into cashier's checks.

On October 16, 1985, Carl returned to the appellant's office with a search warrant. The appellant was told that he was required to file CTRs on all transactions in excess of $10,000.[3] During this search, the IRS seized documents concerning a transaction between the appellant and Robert O'Lear. This transaction is the basis of the second count against the appellant.

O'Lear knew that the appellant was an officer of ICBM, and he went to the appellant to cash a check for $16,662.19 made out to Katherina Wolf. O'Lear used the check to purchase a certificate of deposit (CD) from the appellant for $500.00. The appellant then gave O'Lear the balance of the check in cash. O'Lear received a re-

---

2. Without Carl's last name, it would be impossible to fill out a CTR. Furthermore, the government contends that the appellant never asked for any identification from agent Carl.

3. The appellant filed all the CTRs on October 22, 1985. On the top of each CTR was the statement, "I am not a financial institution."

ceipt, typewritten on FSBL letterhead and dated May 24, 1985, showing that he received $16,162.19 in cash.

O'Lear testified that the cash was United States currency. O'Lear further testified that, despite the fact that the receipt had FSBL letterhead on it, the only institution with which he identified the appellant was ICBM. No CTR was ever filed on this transaction.

Count seven regards different transactions. During 1987, undercover Internal Revenue Service agent Dallas McKnight, Jr. learned that a number of individuals were using the appellant to conduct currency transactions for which no CTRs were generated.

On October 28, 1987, McKnight met with the appellant in Sacramento and converted $15,000 in United States currency. The appellant told the agent that he was the representative of an overseas bank and was excluded from the currency transaction reporting requirements.

McKnight had an unincorporated business organization, which was merely a paper corporation, named South Wind Limited. The appellant explained to McKnight that McKnight could avoid taxation by creating a trust naming FSBL as its beneficiary. FSBL would then give McKnight back all his money.

The appellant also told agent McKnight that the money, though always kept in the United States, was legally overseas. The agent explained that he did not want to open any account with the appellant; rather, he merely wanted to obtain cashier's checks for currency.

The appellant further explained to agent McKnight what his commission would be and stated that this amount would keep McKnight's name off any CTRs. McKnight gave the appellant $15,000 and the appellant gave him three cashier's checks in return.

McKnight also gave the appellant $25,000 on October 29 and November 2, 1987 with which the appellant purchased cashier's checks from First Interstate Bank and from the Bank of Alex Brown. The CTR filed by the Bank of Alex Brown reveals that the appellant gave the $25,000 in a lump sum to the teller and made no effort to conceal his identity.

The district court also had before it testimony from Drew Roddy who had previously been convicted in the Western District of Washington for laundering more than $155,000 through the appellant. Roddy was contacted by one of his clients who wanted a cashier's check for $155,420.77. Roddy contacted the appellant on September 30, 1987 and asked the appellant to obtain a cashier's check for that amount of money. Roddy then flew to Sacramento to consummate the transaction.

Mary Shoup, Contact Representative for the Internal Revenue Service's Detroit Computing Center, testified that no CTR was filed for the Drew Roddy transaction or for the $15,000 transaction with McKnight which was consummated on October 28, 1987.

At the district court level, the appellant waived his rights to a jury trial, to confront witnesses, and to subpoena witnesses. He consented to a trial on the written record, and the parties submitted their arguments and evidence through briefs and exhibits.

The court returned guilty verdicts on counts one through seven and not guilty verdicts on counts eight and nine. The appellant was sentenced to four years for each count to run concurrently with each other and with the sentence imposed by the United States District Court for the Western District of North Carolina[4] and a fine of $20,000 on counts one through six.

The appellant appealed to this court claiming that the government failed to prove a conspiracy, the indictment failed to allege a crime with sufficient specificity,

---

4. The District Court in North Carolina sentenced the appellant to nine years' imprisonment, three years' supervised release, and a $30,000 fine for conspiracy to impair and impede the Internal Revenue Service, conspiracy to tamper with witnesses, and witness tampering.

and the trial court erred in denying the suppression of evidence on count two.

We affirm the district court's holding.

## II. Discussion

### A. *Did the Evidence Establish the Existence of a Conspiracy?*

#### 1. Standard of Review

■ To determine whether the evidence is sufficient to support the criminal conviction, the Court asks whether, after "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Melchor–Lopez*, 627 F.2d 886, 890 (9th Cir.1980).

#### 2. Analysis

■ "The essential elements of conspiracy, which have been stated repeatedly in the decisions of this circuit, are 'an agreement to accomplish an illegal objective coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit that underlying, substantive offense.'" *Melchor–Lopez*, 627 F.2d at 890. Inferences of the existence of such an agreement may be drawn "if there be concert of action, all parties working together understandingly, with a single design for the accomplishment of a common purpose." *Id.* Moreover, "[k]nowledge of the objective of the conspiracy is an essential element of any conspiracy conviction." *United States v. Krasovich*, 819 F.2d 253 (9th Cir.1987).

■ "There is neither a true agreement nor a meeting of the minds when an individual 'conspires' to violate the law with only one other person and that person is a government agent." *United States v. Escobar de Bright*, 742 F.2d 1196, 1199 (9th Cir.1984). An individual must conspire with at least one bona fide co-conspirator to meet the formal requirements of a conspiracy. *Id.*

■ However, "mere association with members of a conspiracy, the existence of an opportunity to join the conspiracy, or simple knowledge, approval of, or acquiescence in the objective or purpose of the conspiracy, without an intention and agreement to accomplish a specific illegal objective, is not sufficient to make one a conspirator." *Melchor–Lopez*, 627 F.2d at 891.

In this case, the appellant argues that the only agreement into which he entered was with Carl, the Internal Revenue Service agent. The government, on the other hand, contends that the appellant entered into an agreement with Bates and an agreement with Gorman and Salisbury.

### a. *The Conspiracy with Bates*

■ The government points to the initial meeting between the parties to establish Bates as a conspirator. Throughout that meeting, Bates led the discussion explaining the operation and continually used the word "we," meaning himself and the appellant, when referring to how the operation worked.[5] The government asserts that Bates and the appellant show that they acted in concert by stating that they were trying to combat the Internal Revenue Service together.[6]

The government further contends that the appellant also used the word "we" throughout his discussions. For example, when agent Mulholland asked the appellant how many people he and agent Carl would be dealing with, the appellant responded, "it's still just the two of us." The "two of us" referred to the appellant and Bates.

The government contends that the most telling statement that shows that the appellant and Bates acted together occurred

---

5. For example, Bates, when describing how the operation worked, said, "It doesn't go to the bank. When we—first of all, this is very important right now.... We have an arrangement set up where the money is not given to First Surety Bank. We have an arrangement where (unintelligible) bank gets them but it is given to ICBM...."

6. Bates stated, "[E]verything we're doing is again we are trying to get everything we have together to play their stupid game, the IRS—the IRS has developed the games. We have to find ways to combat that dumb game."

when Carl asked what would happen if he was unable to get in touch with the appellant. Bates responded by saying, "[T]here is nobody but Lonnie and myself anyhow." The appellant then added, "[Bates] probably would be the only backup and then we don't want anyone else involved in what is going on."

However, the appellant argues that the meeting shows that the two were not acting in agreement. The appellant states that the meeting illustrates that only the appellant, and not Bates, was involved in the banking scheme.[7] The appellant also states that the record shows that Bates was disinterested in being a party to the agreement.[8]

The appellant also claims that the fact that he made the commission deal with agent Carl and the fact that he said he, and not he and Bates, would work things out with the agents, illustrates that he was in agreement only with the agents.

Finally, the appellant points to the fact that he explained that Bates had a completely different purpose for attending the August 10 meeting. Agent Carl stated that he did not want Bates involved in the operation anymore because Carl feared for his own safety. He felt that Bates talked too much. The appellant stated, "[Bates] was here under the other circumstances." Thus, the appellant claims that if he and Bates had agreed to act in concert, they had not agreed to commit the same offense.

The court must look at the evidence in a light most favorable to the government. We must ask whether any rational trier of fact could look at the evidence and conclude that the appellant and Bates agreed to commit the same offense and had the intent to carry out the offense beyond a reasonable doubt. We conclude that a rational trier of fact could, beyond a reasonable doubt, conclude that both men were co-conspirators.

Although the appellant and Bates seemingly had different functions in the operation, the evidence shows that they could have agreed to launder the money and could have formed the requisite intent to carry this out. The evidence shows that Bates was indeed a part of the first meeting. Furthermore, Bates and the appellant seemed to be acting together in this venture; Bates did explain the operation, had a full understanding of what was going on, and was to serve as the appellant's backup contact for the agents. To act together does not mean that both had to carry out the same duties.

The evidence shows that a rational trier of fact could conclude beyond a reasonable doubt that Bates was not merely associated with the operation. Any rational trier of fact could conclude that Bates was a member who was in agreement with the appellant as to the goal of the operation: evading the requirement of filing CTRs.

Thus, we conclude that a conspiracy existed between Bates and the appellant.

b. *The Conspiracy with Gorman and Salisbury*

█ The government contends that the appellant also conspired with Gorman and Salisbury. It claims that during the August 10 conversation, several references were made by Salisbury and the appellant to working out an arrangement whereby agent Carl would be bringing currency to the appellant for conversion.

---

7. When Mulholland asked how many people he and Carl would be dealing with, the appellant responded just he and Bates would be involved. The appellant then went on to state, "And basically—and this—everything to do with banking is my primary responsibility ... and to maintain privacy, [Bates] primarily deals in another aspect entirely, but is familiar with what we're doing.... And so it would be a confidential situation between myself and whoever was—was coming in."

8. MULHOLLAND: Well, let's see what we can work out as far as—as an agreement, so that there is a meeting of the minds, and we all agree with what we want to do.
APPELLANT: Okay.
MULHOLLAND: And once we do that, then you know ...
BATES: Are you guys hungry or something? Do you want to get a—
MULHOLLAND: No, we just had a bite. We just had a bite. Thank you.

The government contends that the appellant made an agreement with Salisbury to divide the fees that Carl would pay the appellant. The evidence shows that agent Carl would have testified that the August 22, 1985 meeting was to clarify the trouble between the appellant and Salisbury and Gorman over the division of fees that Carl was paying the appellant.

The appellant argues that no conspiracy existed between him and Salisbury and Gorman. The appellant states that the evidence shows that Salisbury and Gorman had an agreement with Mulholland to which the appellant was not a part. The appellant asserts that Gorman had an agreement with Mulholland concerning a "warehouse banking concept." Since the appellant knew nothing of this agreement, he argues that this shows that no agreement between him and Salisbury and Gorman existed.

However, the appellant's arguments fail. A rational trier of fact could conclude that an agreement existed beyond a reasonable doubt. Agent Carl would have testified that the August 22 meeting occurred in order for Gorman and Salisbury to iron out their agreement with the appellant. Also, the fact that an agreement existed between Salisbury, Gorman, and Mulholland, to which the appellant was not a party, does not mean that a different agreement was not reached at the August 10 meeting. Furthermore, a rational trier of fact could conclude that an agreement was reached at the August 10 meeting.

Therefore, we affirm the district court's holding that a conspiracy existed between the appellant and Gorman and Salisbury.

B. *Did the Indictment Allege a Crime With Sufficient Specificity?*

1. Standard of Review

■ This Court reviews the legal sufficiency of an indictment *de novo*. *United States v. Dela Espriella*, 781 F.2d 1432 (9th Cir.1986).

2. Analysis

■ "An indictment is sufficient if it contains the elements of the charged crime in adequate detail to inform the defendant of the charge and to enable him to plead double jeopardy." *United States v. Buckley*, 689 F.2d 893, 896 (9th Cir.1982). "Two corollary purposes of an indictment are: (1) to ensure that the defendants are being prosecuted on the basis of the facts presented to the grand jury, and (2) to allow the court to determine the sufficiency of the indictment." *Id.* The government need only allege the "essential facts necessary to apprise a defendant of the crime charged" and not its theory of the case. *Id.*

In this case, the appellant argues that the indictment failed to allege a crime with sufficient specificity. The appellant states that the government's statement, "Individuals who engaged in substantial exchanges of currency were 'financial institutions' required to file CTRs pursuant to Title 31, Code of Federal Regulations, Section 103.-11," subsumes all participants in a currency transaction over $10,000, thereby nullifying the legal limitations on persons required to file CTRs. That is, the appellant argues that this statement is erroneous because it asserts that all people who physically transfer more than $10,000 in currency would be financial institutions. The appellant argues that this regulation does not apply because he is not a financial institution.

The appellant also argues that the indictment does not specify which of the two theories the government was pursuing: (1) that the appellant was a financial institution who conspired with Bates to commit the offenses of failing to file the CTRs; and (2) that the appellant, conspiring with Bates, impeded and obstructed the IRS' information acquisition by causing commercial banks to file false CTRs which failed to identify the true source of the funds.

Furthermore, the appellant argues that the indictment fails to charge the appellant with violating the only statutes which would be applicable to the government's

prosecution: 31 U.S.C. § 5324, 18 U.S.C. §§ 1956 and 1957, and 26 U.S.C. § 6050I.

The government, on the other hand, contends that the indictment is pled with sufficient specificity. The government claims that it did not allege that the appellant caused banks to file false CTRs. The government simply states that the indictment charges the appellant with being a financial institution who did not file CTRs even though required by law.

█ The appellant's argument has no merit. The indictment is not ambiguous; in fact, it is very specific in setting out the government's theory of prosecution. The indictment apprised the appellant of the crime charged against him. Moreover, the phrase, "Individuals who engaged in substantial exchanges of currency were 'financial institutions' . . ." does not have the meaning the appellant is trying to give it. Read in context, it merely states that the appellant and Bates were financial institutions who made transfers of more than $10,000. Thus, the indictment does contain the elements of the crime charged in adequate detail to inform the appellant of the charges against him.

Thus, we affirm the district court's ruling and hold that the indictment was pled with adequate detail.

### C. *Did the Appellant Act as a Financial Institution?*

#### 1. Standard of Review

█ Interpretation of statutes and regulations are reviewed *de novo*. *United States v. Varbel*, 780 F.2d 758, 761 (9th Cir.1986).

#### 2. Analysis

A financial institution is defined as:

A person who is engaged as a business in dealing in or exchanging currency as, for example, a dealer in foreign exchange or a person engaged primarily in the cashing of checks.

31 C.F.R. § 103.11(3). This definition is quite broad and is consistent with Congress' intent to create a "sweeping law enforcement tool for locating *inter alia*,

large transfers, in currency, of the proceeds of unlawful transactions." *United States v. Dela Espriella*, 781 F.2d 1432, 1437 (9th Cir.1986). "Congress recognized the importance of reports of large and unusual currency transactions in ferreting out criminal activity and desired to strengthen the statutory basis for requiring such reports." *Id.*

The definition under 31 C.F.R. § 103.11(3) is broad enough to include private individuals and money launderers. *Dela Espriella*, 781 F.2d at 1437; *United States v. Goldberg*, 756 F.2d 949 (2d Cir.1985).

█ The government contends that the evidence shows that the appellant is, indeed, a financial institution. Before he began dealing with the government agents, he cashed a check and gave a customer more than $10,000 in cash without filing a CTR. Furthermore, over a two month period in 1985, the appellant converted $175,000 in currency into cashier's checks or wire transfers without filing CTRs. The evidence, the government contends, also discloses the appellant's willingness to convert up to $3 million per month in narcotics money into cashier's checks and wire transfers.

The government also points to evidence that the appellant, in 1987, converted approximately $155,000 in cash into a cashier's check. Moreover, he converted $15,000 in cash into cashier's checks for agent McKnight.

The appellant, on the other hand, contends that he does not fit the definition of a financial institution. The appellant states that he was just a courier for the agents who brought their money to the various banks to get the cashier's checks. He claims that he had no reserve of cash or cashier's checks to complete the transactions himself; rather, he claims to have simply gone to the banks to exchange cash for the agents.

The appellant cites *United States v. Murphy*, 809 F.2d 1427 (9th Cir.1987) as controlling. In that case, the defendants laundered $4 million for two undercover agents by depositing the money in a domes-

tic bank in such a manner as to conceal the true source and ownership of the money from the Internal Revenue Service. The defendants were charged with conspiring to conceal and falsify material facts within the jurisdiction of the Internal Revenue Service and with conspiring to defraud it in its collection of information. The court held that there was a duty of disclosure, but there was no duty to disclose the source of the funds. *Id.* at 1431. Therefore, the court held that there was no concealment or conspiracy to conceal. *Id.*

However, the appellant's arguments have no merit. First, the *Murphy* case does not apply to this case. The appellant in *Murphy* was not a financial institution. Furthermore, the appellant in this case was not charged with causing banks to file CTRs which did not list the true source of the funds; rather, the appellant was charged with being a financial institution and with failing to file timely CTRs. Thus, the appellant's reliance on this case must be disregarded.

Furthermore, the policies behind the regulation, as enunciated in the *Dela Espriella* case, support the government's argument that the appellant was a financial institution. Private individuals and money launderers are included within the broad sweep of the definition of a financial institution. Here, the appellant was clearly a money launderer.[9] The evidence shows that, even though the appellant was initially told that the money was from a legal source, agent Carl later told the appellant on several occasions that the money was from a criminal enterprise. The appellant, with this knowledge, continued to make transactions for the agent.

Thus, the appellant was clearly a financial institution. We therefore affirm the holding of the District Court.

### D. *Suppression of the Evidence*

#### 1. Standard of Review

■ Motions to suppress are generally reviewed *de novo*. *United States v. Thomas*, 863 F.2d 622, 625 (9th Cir.1988). This includes whether a search warrant describes the items to be seized with sufficient particularity. *See United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir.1986).

■ However, a "magistrate's determination of probable cause is treated with great deference and is not reviewed *de novo.*" *United States v. Alexander*, 761 F.2d 1294, 1300 (9th Cir.1985). The court may not reverse a magistrate's finding of probable cause unless it is clearly erroneous. *United States v. McQuisten*, 795 F.2d 858, 861 (9th Cir.1986). The court need only find that, "under the totality of the circumstances, the magistrate had a substantial basis for concluding that probable cause existed." *Id.* "In doubtful cases, preference should be given to the validity of the warrant." *Id.*

#### 2. Was the Search Warrant Overbroad?

The appellant has appealed only that portion of the search warrant which relates to the suppression of the evidence on count two of the indictment. The only evidence seized in the search relating to count two was a receipt for over $10,000 in cash by O'Lear.

■ The Fourth Amendment requires a search warrant to describe the items to be seized with sufficient particularity to prevent "general exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). "The warrant must particularly describe both the place to be searched and the person conducting the search reasonably to identify the things authorized to be seized." *Spilotro*, 800 F.2d at 963. "The description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized." *Id.*

"In determining whether a description is sufficiently precise, we have concentrated on one or more of the following: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out ob-

---

**9.** Money laundering is defined as a process by which cash derived from a criminal enterprise may be easily exchanged without a trace of its origin. *United States v. Cuevas*, 847 F.2d 1417 (9th Cir.1988).

jective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the item more particularly in light of the information available to it at the time the warrant was issued." *Id.*

### a. *Was There Probable Cause to Seize the Items in the Search Warrant?*

 The appellant claims that there was insufficient probable cause to permit such a search and seizure of all the records. The appellant cites *United States v. Offices Known as 50 States Distributing Co.*, 708 F.2d 1371 (9th Cir.1983), to support its argument. In that case, we held that a warrant allowing for the seizure of every piece of paper or documents relating to a business is proper when probable cause exists that the enterprise is permeated by fraud. *Id.* at 1374. The appellant states that because the search warrant did not allege that the businesses involved were permeated by fraud, probable cause did not exist to seize all the records.

However, the appellant's arguments have no merit. *50 States Distributing Co.*, does not apply to this case. In that case, fraud was one of the crimes with which the government charged the appellant. Thus, in order to seize all the business documents to prove that the appellant was involved in fraudulent conduct, the government had to have probable cause that the business records were permeated by fraud. In the case before us, the government charged the appellant with failing to file the CTRs. Thus, fraud is not one of the charges against the appellant.

The government, however, states that probable cause did, in fact, exist. It states that the affidavit for the search warrant listed five instances where the appellant had received in excess of $10,000 without filing a CTR. The affidavit also included the appellant's statement that he never filed the CTRs and that he cashed checks for other clients from the large amount of currency he maintained in his safe.

Looking at the totality of the circumstances, the magistrate had a substantial basis for concluding that probable cause existed. The affidavits showed that the appellant engaged in a series of transactions in which he accepted United States currency in exchange for cashier's checks and wire transfers. The magistrate's finding that probable cause existed is therefore not clearly erroneous; the magistrate could reasonably have found, based on the affidavits before him, that the appellant was acting as a financial institution, that he violated federal law, and that the evidence could be found in his office.

Thus, we affirm the district court's holding.

### b. *Was the Warrant Particularized?*

 For a warrant to be valid, it must be "reasonably specific, rather than elaborately detailed, in its description of the objects of the search." *United States v. Brock*, 667 F.2d 1311, 1322 (9th Cir. 1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1271, 75 L.Ed.2d 493 (1983); *See United States v. Holzman*, 871 F.2d 1496, 1508 (9th Cir.1989). This circuit follows the rule that where invalid portions of a warrant may be stricken and the remaining portions held valid, seizures pursuant to the valid portions will be upheld. *Spilotro*, 800 F.2d at 967. Suppression of the evidence is justified when no portion of the warrant is sufficiently particularized to pass constitutional muster. *United States v. Cardwell*, 680 F.2d 75, 78 (9th Cir.1982).

 The appellant claims that the warrant is defective because the government failed to utilize the results of its investigation and available information to describe more particularly the items to be seized and refine the scope of the warrant. *See Id.* The appellant claims that the warrant should have been particularized to business records relating to currency transactions exceeding $10,000. While the appellant admits that the affidavit specifically alleged the failure to file CTRs on currency transactions exceeding $10,000, the appellant claims that it did not detail the particular items to be seized.

Rather, the appellant claims that the affidavit authorized the wholesale seizure of entire categories of items, even those not generally evidence of criminal activity, and provided no guidelines to distinguish items

which it had probable cause to seize and those which it did not. *See Spilotro*, 800 F.2d at 964. The appellant also points to the inventory list which, he claims, shows that most of the items seized were not even related to CTR violations.

The appellant cites *Cardwell* to support his argument. In *Cardwell*, the court held that the search warrant was not sufficiently particular. The warrant directed the authorities to seize:

> ... corporate books and records, including but not limited to cancelled and duplicate checks, check stubs, journals, ledgers, weekly summaries, driver trip envelopes, and daily schedules of the fellowing [sic] corporations: Midwest Growers Cooperative Corporation, Coast Express, Inc., West Coast Systems Inc., and Interstate Carriers Corporation which are the fruits and instrumentalities, of violations of 26 U.S.C. § 7201.

680 F.2d at 76. The court held that no portion of the search warrant was sufficiently particularized to pass constitutional muster and ruled that total suppression was required. *Id.* at 78.

The government contends that the search warrant clearly limits the documents to be seized by time, from November 2, 1984 to the time the search warrant was being executed, October 16, 1985. Furthermore, it claims that the warrant is limited to the records from FSBL, the appellant, ICBM, and Bates and to only those records relating to the cashing, exchanging, or handling of cash or cash equivalents in the amount of $10,000 or more. Thus, the government contends that the warrant has met the specificity requirements.

We feel that the warrant is indeed sufficiently specific. First, the appellant is only trying to suppress evidence pertaining to count two. The search warrant is obviously specific enough as to this. The warrant states that the agents were to search for:

> Records for the period November 2, 1984 to the present for FIRST SURETY BANK LIMITED (FSBL), INTERNATIONAL COMMERCIAL BANK MANAGEMENT (ICBM), LONNIE G. SCHMIDT, and HERBERT A. BATES, which relate to the cashing, exchanging

or handling of cash or cash equivalents in amounts of $10,000 or more.

This is sufficiently specific. The government is not required to list the items in the elaborate detail which the appellant is asking.

Also, *Cardwell* can be distinguished from the case at hand. In that case, no part of the warrant was reasonably specific. The Court's holding that the government failed to "utilize the results" and available information to particularize the warrant must be read in this light. In that case, the warrant was not specific at all. The government could have used the information it had to make it sufficiently specific. However, in the case at hand, the government did use the available information to particularize the warrant sufficiently.

Thus, we hold that the warrant is sufficiently specific.

### c. *Is the Warrant Facially Overbroad?*

The appellant finally argues that the warrant must fail because it is facially overbroad. The appellant states that all the limitations stated in the warrant are not limitations at all because they still allow the government to search the whole premises.

The appellant also argues that the good faith exception does not apply. When agents have executed a warrant that is subsequently found to be defective, suppression of the evidence is not a proper remedy if the agents acted in good faith. *United States v. Leon*, 468 U.S. 897, 922, 926, 104 S.Ct. 3405, 3420, 3422, 82 L.Ed.2d 677 (1984). The appellant contends that the agents could not have acted in good faith in enforcing the warrant because the warrant was facially overbroad.

The appellant cites *United States v. Crozier*, 777 F.2d 1376 (9th Cir.1985), for support. In that case, the Court held that a warrant was facially overbroad to the extent that the officers could not have acted in good faith in enforcing it. *Id.* at 1382. The warrant did not particularize any property to be seized; it merely authorized the seizure of "material evidence of violation 21 USC 841, 846 (Manufacture and Posses-

374

sion with intent to distribute Amphetamine and Conspiracy)." *Id.* at 1381. The affidavit was more detailed, but the agent did not have it when executing the warrant.

 However, we hold that the warrant is not facially overbroad. Even if we consider the warrant to be so, the good faith exception applies. This case can be distinguished from *Crozier.* In that case, the warrant did not particularize any property to be seized. In this case, the warrant was particular as to what records and evidence the agents were to search for and the time periods in which the relevant record could be found. This is much more specific than the warrant in *Crozier.* Thus, the good faith exception applies and the receipt in question was admissible.

Therefore, the search warrant is valid, and we affirm the district court's ruling.

### III. Conclusion

We AFFIRM the district court's holding on all issues before us.