999 F.2d 545
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gregory MAYS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John Washington PAULEY, Defendant-Appellant.
 Nos. 91-10482, 91-10502.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 10, 1993.
Decided July 20, 1993.
 
 1
 Before: CHOY, PREGERSON, and BEEZER, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 
 3
 Defendants Gregory Mays and John Washington Pauley appeal their convictions for conspiracy to possess with intent to distribute cocaine and attempt to possess cocaine. Mays also appeals his sentence.[1]
 
 I. BACKGROUND
 
 4
 On March 16, 1990, Victor Suarez was arrested on a charge of possession of heroin for sale. Suarez agreed to help the police apprehend large-scale drug dealers. The police decided to set up a "reverse sting," using undercover law enforcement operatives to sell cocaine to would-be distributors. Suarez was told that any sale would have to be for at least five kilograms ("kilos"), pursuant to the Drug Enforcement Agency's ("DEA") policy regarding reverse undercover operations.
 
 
 5
 On the day of his arrest Suarez made a recorded call to Aubry Randle, offering to sell him ten kilos of cocaine.[2] Randle said he would call his "buddy" and get back to Suarez. Suarez was given equipment to record all calls he made regarding narcotics. Later that evening, Suarez and Randle spoke on the phone and Randle asked to buy one kilo. In a subsequent call, Suarez told Randle that his source sold in fives and tens.
 
 
 6
 After March 16th, Suarez made several additional calls, unsuccessfully trying to reach Randle. On March 23, 1990, Suarez went to an area of San Francisco known for drug-dealing to look for Mays because, according to Suarez, Mays and Randle were partners. Suarez went to a "rock house" to look for Mays and met defendant Pauley. According to Suarez, after hearing about the cocaine, Pauley expressed an interest in getting "in on the action" and buying one kilo. Pauley told Suarez he could help him get in touch with Mays.
 
 
 7
 A phone call was made from the "rock house" to Mays and, according to Suarez, Mays told Suarez he might be able to handle three kilograms. To meet the five kilo minimum, Suarez told Mays that he would buy the fifth kilo and then broker it back to Mays the next day after Mays sold one of his kilos. Later that day, in a recorded conversation, Mays told Suarez that he would be "ready for the whole five" the next day.
 
 
 8
 On May 30, 1990, Suarez, with undercover DEA Agent Rosario, met Mays and Pauley in a Denny's parking lot. Pauley stayed in the car. Mays showed Suarez the money in his car trunk and Suarez showed Mays the cocaine. Mays and Pauley were arrested.
 
 
 9
 At trial Mays asserted an entrapment defense. Mays testified that he first met Suarez in 1986 and bought small amounts of cocaine from Suarez for two to three months. Mays contends that prior to this deal, he had not heard from Suarez in four years. He also asserts that he was not partner with Randle and never dealt cocaine with Randle. In direct contrast to Mays' testimony, Suarez testified that he sold cocaine to Mays or Randle 25 or 30 times, and that Mays and Randle were partners.
 
 II. DISCUSSION
 A. Mays' Motion for a Franks Hearing
 
 10
 In connection with Mays' arrest a number of locations were searched, including an apartment at 14 Shotwell Street. Randle was the lessee of the apartment and was present when police arrived. The police found a paraphernalia associated with cocaine as well as a pound of cocaine at the Shotwell apartment.
 
 
 11
 Prior to pleading guilty, Randle made a motion to suppress the evidence seized at the Shotwell apartment and for a Franks hearing regarding the affidavit used to obtain the search warrant for the Shotwell apartment. Mays joined in Randle's motion and filed his own motion for the same relief. Mays alleged that the affidavit used to obtain the search warrant for the Shotwell apartment contained false information and was misleading. The district court denied Mays' motion. Mays contends that the district court erred in denying his request for a Franks hearing.
 
 
 12
 To obtain an evidentiary Franks hearing, a defendant must make a substantial showing that there are intentionally or recklessly false statements in the affidavit. Franks v. Delaware, 438 U.S. 154, 171 (1978). The Ninth Circuit has extended Franks to cover "deliberate or reckless omissions [from the affidavit] of facts that tend to mislead." United States v. Stanert, 762 F.2d 775, 781 (9th Cir.), amended, 769 F.2d 1410 (9th Cir.1985). If the warrant affidavit contains sufficient information to support a finding of probable cause after the false statement is corrected and the omitted facts are added, "no hearing is required." Franks, 438 U.S. at 172.
 
 
 13
 Mays argues that the affidavit in support of the search warrant for the Shotwell apartment contained an intentional and material falsehood. Mays alleges that a statement in the affidavit asserting that Mays told California Department of Corrections ("CDC") Agent Hensen that he had lived in the Shotwell apartment for approximately a year was intentionally false. Mays also argues that many material facts were intentionally or recklessly omitted from the affidavit. Mays contends that without the false statement and the omissions, probable cause would not have existed for the warrant, and that a hearing should have been held pursuant to Franks v. Delaware.
 
 
 14
 In denying the motion for a Franks hearing, the district court erroneously stated that a defendant may only challenge the veracity of the affiant. See United States v. DeLeon, 979 F.2d 761, 764 (9th Cir.1992). Therefore, the fact that Mays contested the veracity of Agent Hensen, who was not the affiant, does not provide a basis for denying his motion for a Franks hearing.
 
 
 15
 Although the district court erred in assuming that Mays could only challenge the veracity of the affiant, that does not mean that Mays should have been granted a Franks hearing. We find that even if Agent Hensen's alleged misstatement is removed and the omitted facts are included, the affidavit in support of the search warrant contains sufficient information to establish probable cause. Therefore, a Franks hearing was not required. Franks, 438 U.S. at 172.
 
 
 16
 Within his discussion concerning the Franks hearing, Mays also asserts that there was a factual dispute regarding whether the decision to seek the warrant for the Shotwell apartment was made before or after allegedly illegal searches of the apartment were conducted. Mays argues that the district court should have held an evidentiary hearing on this matter. See Murray v. United States, 487 U.S. 533, 542-44 (1988). We find that this issue was not raised sufficiently below for the trial court to rule of it. See In re E.R. Fegert, Inc., 887 F.2d 955, 957 (9th Cir.1989). Therefore, we consider this issue waived on appeal. See United States v. Rascon, 922 F.2d 584, 587-88 (10th Cir.1990), cert. denied, 111 S.Ct. 2037 (1991).[3]
 
 B. Parole Searches
 
 17
 As a condition of Mays' parole, he agreed that his residence and any property under his control could be searched without a warrant by law enforcement officers. On the same day that the Shotwell apartment was searched, officers conducted parole searches of three locations, 6 Westbrook Court, 1303 Fell Street, and a storage locker at 43 Page Street. These parole searches were authorized by CDC Agent Hensen.
 
 
 18
 Mays argued before the district court that these parole searches violated the Fourth Amendment. Mays asserted that the parole searches were really subterfuge for searches aimed at uncovering evidence to use against him in criminal prosecution. Mays also asserted that the search of the Fell Street apartment was not a valid parole search even if it was not subterfuge.
 
 
 19
 The district court found that there was no subterfuge and that the police had a reasonable basis to believe Mays lived at the Fell Street apartment. We review the district court's findings concerning the parole searches under the clearly erroneous standard. United States v. Harper, 928 F.2d 894, 897 (9th Cir.1991).
 
 
 20
 While "the police may not use a parole officer as a 'stalking horse' to evade the fourth amendment's warrant requirement ... police and parole officers are entitled to work together to achieve their objectives; concerted action does not in and of itself make a search constitutionally infirm." Id. (citations omitted).
 
 
 21
 Mays argued that although Agent Hensen authorized the parole searches, there is no evidence indicating that Agent Hensen requested the parole searches for independent reasons relating to Mays' parole. Mays contends that without evidence showing that Agent Hensen requested the searches, the only reasonable conclusion that can be drawn is that the searches were conducted to strengthen the criminal case against him.
 
 
 22
 The district court did not explain in detail the reasons behind its finding. It appears that the district court concluded that since the searches were conducted after the arrest, Agent Hensen had good reason to believe that Mays was violating his parole agreement. This conclusion is as reasonable as the one offered by Mays. See United States v. Dally, 606 F.2d 861, 863 (9th Cir.1979). Since concerted action alone does not lead to an inference of subterfuge, the district court's ruling is not clearly erroneous. Harper, 928 F.2d at 897; see also United States v. Jarrad, 754 F.2d 1451, 1454 (9th Cir.), cert. denied, 474 U.S. 830 (1985).
 
 
 23
 Mays also argues that the search of the Fell Street apartment was not a valid parole search, even if the search was not subterfuge. There is some dispute over whether Agent Hensen authorized a search of Apt. 7 or of Apt. 3 at 1303 Fell Street. Since the evidence reveals that the officers conducting the search at 1303 Fell Street had a reasonable basis to believe Apt. 7 was one of Mays' residences, we find that the search of Apt. 7 was a valid parole search. See Dally, 606 F.2d at 863.
 
 C. Barring Randle's Testimony
 
 24
 At trial, Mays sought to call Randle as a witness. Randle's counsel stated that Randle would assert his Fifth Amendment rights if he was questioned about events prior to May 16, 1990. The district court conducted a "dry run" of Randle's testimony outside the presence of the jury. During this dry run, Mays' counsel elicited from Randle (1) that cocaine found in the Shotwell apartment was possessed by Randle, not Mays, and (2) that Randle had discussed the Suarez deal with Mays twice, and in those discussions, Mays did not agree to participate in the deal.
 
 
 25
 The prosecutor informed the court that on cross-examination he would question Randle about events prior to May 16th. The prosecutor stated that he would ask Randle about his relationship in the past with Suarez and Mays, to establish that there was a prior relationship between these individuals. After hearing the prosecutor's intended line of inquiry on cross-examination, the district court decided not to allow Randle to testify. Mays argues that the district court's decision to bar Randle from testifying violated his right to due process and compulsory process.
 
 
 26
 Striking a witness's entire testimony because he invokes the Fifth Amendment is "an extreme sanction." United States v. Lord, 711 F.2d 887, 892 (9th Cir.1983). However, "[w]here a defense witness refuses to answer questions that go to the heart of the direct testimony on a central issue ... the truth seeking function of the court is impaired." Denham v. Deed, 954 F.2d 1501, 1504 (9th Cir.1992). Therefore, a district court may bar "a defense witness's testimony when the witness has refused on cross-examination to respond to questions on non-collateral matters." Id.
 
 
 27
 We have previously noted that "[t]he distinction between matters which are 'collateral' and those which are 'direct' is not precise or easy." United States v. Seifert, 648 F.2d 557, 561 (9th Cir.1980). Since the distinction between matters which are collateral and those which are direct can only be made by referring to the particulars of the case at hand, " '[a] trial court has wide discretion to determine whether a witness's testimony must be stricken because cross-examination was restricted.' " Seifert, 648 F.2d at 561-62, (quoting United States v. Star, 470 F.2d 1214, 1217-18 (9th Cir.1972)).
 
 
 28
 While the prosecutor's questions did not concern details regarding the subject matter of Randle's direct testimony, they were not aimed at simply impeaching Randle's credibility. With regard to the first area of Randle's testimony indicating that the Shotwell apartment cocaine was Randle's, the prosecutor wanted to inquire into Randle's past relationship with Mays to reveal that Mays was staying at the Shotwell apartment and that they had done cocaine deals in the past. With regard to Randle's testimony concerning his discussions with Mays about the Suarez deal, that direct testimony was being elicited for the purpose of showing that Mays was not predisposed to deal drugs. Therefore, cross-examination questions designed to show, through Mays' and Randle's prior relationship, that Mays was predisposed to deal drugs do go to the heart of Randle's direct testimony on a central issue. Denham, 954 F.2d 1504. Accordingly, we find that the trial court's decision to bar Randle's testimony did not amount to an abuse of discretion.
 
 
 29
 D. DEA Agent Vouching for Government Witness
 
 
 30
 During direct examination of DEA Agent Rosario, the prosecutor asked Agent Rosario why he did not turn down Suarez's offer to help apprehend drug dealers. Trial counsel for defendant Pauley objected to the question and was overruled. Agent Rosario responded: "With respect to Mr. Suarez after I heard the telephone conversation I believed that it was a legitimate offer. Everything seemed to be right." Pauley's counsel moved to strike that testimony and was overruled.
 
 
 31
 Pauley argues that the prosecutor--and by extension, his chief investigator--had a duty to avoid improperly vouching for the credibility of a prosecution witness. Pauley contends that Agent Rosario's testimony improperly put the prestige of the government behind Suarez's testimony. This argument lacks merit. Agent Rosario's testimony did not amount to personal vouching of Suarez's veracity as a witness. Rather it explained why he decided to work with Suarez as a government informant.
 
 E. Entrapment Jury Instruction
 
 32
 Mays requested a jury instruction on entrapment which would inform the jury that "[t]he prosecution must show that the Defendant was willing to commit the offense at the time when the government agents initially contacted the Defendant to propose the wrongful conduct." The court found Mays' proposed instruction "reasonable" and agreed to "weave it" into the entrapment instruction. When giving the entrapment instruction the court inadvertently failed to weave in the requested language. Mays did not object when the court gave the entrapment instruction.
 
 
 33
 Under Ninth Circuit law, the need to object to a jury instruction is only dispensed with if such "an objection would be a 'pointless formality.' " United States v. Payne, 944 F.2d 1458, 1464 (9th Cir.1991), cert. denied, 112 S.Ct. 1598 (1992). When a court expresses willingness to use a party's offered instruction and accidently fails to do so, a timely objection by the party would not be a 'pointless formality' since it would allow the court to correct the error. Id. Therefore, we review the entrapment instruction for plain error.
 
 
 34
 Mays argues on appeal that the instruction given by the district court failed to make clear that evidence had to show Mays was ready to sell drugs when he was solicited on May 23rd to defeat the entrapment defense. Mays contends that the instruction given suggested that any previous intention by Mays to violate narcotics laws would defeat the entrapment defense.
 
 
 35
 The district court instructed the jury that it was their duty to find the defendants not guilty "[i]f the evidence in the case should leave you with a reasonable doubt as to whether any of the defendants had a previous intention to commit any of the crimes charged in the indictment apart from the inducement ... of the government." The link in the instruction of "a previous intention" to "the crimes charged in the indictment," which occurred in May 1990, makes it clear that Mays' predisposition to sell drugs four years earlier would not defeat his entrapment defense. The entrapment instruction given by the district court did not constitute plain error. See United States v. Tom, 640 F.2d 1037, 1041 (9th Cir.1981).
 
 F. Conspiracy Instruction
 
 36
 Count one of the indictment charged defendants with conspiring to possess with intent to distribute cocaine. The district court's conspiracy instruction did not mention the fact that one must conspire with someone other than a government agent to be guilty of conspiracy. See United States v. Schmidt, 947 F.2d 362, 367 (9th Cir.1991). Neither defendant objected to this conspiracy instruction.
 
 
 37
 Pauley now argues that it was plain error for the district court to fail to instruct the jury that he could not be found guilty of conspiracy on the basis of a finding that he agreed with Suarez to commit an unlawful act. Pauley contends that one or more of the jurors could have convicted him of the conspiracy count because they found that he agreed with Suarez at the rock house to buy cocaine. These jurors may never have gone on to consider whether Pauley conspired with Mays.
 
 
 38
 Pauley analogizes this error to a court's failure to give a specific unanimity instruction. The Ninth Circuit has at times reversed convictions where there is a "genuine possibility" that the jury's guilty verdict was not based on a unanimous finding on a given set of facts. Normally, all that is required is a general instruction that the jury's verdict must be unanimous. However, when "there is a genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts, the general unanimity instruction does not suffice." United States v. Echeverry, 719 F.2d 974, 975 (9th Cir.1983); see also United States v. Payseno, 782 F.2d 832, 837 (9th Cir.1986).
 
 
 39
 The line of cases Pauley relies on, dealing with the need for a specific unanimity instruction, note that such an instruction is only required when the case is factually complicated or presents some unusual circumstance leading to doubt over the jury's unanimity. The evidence in this case concerning Pauley and Mays' agreement to purchase drugs was not particularly difficult or complex. Accordling, we reject Pauley's assertion that there is a "genuine possibility" that some of the jurors convicted him of conspiracy with Suarez, and therefore failed to consider whether he conspired with Mays.
 
 G. Determination of the Quantity of Cocaine
 
 40
 Under 21 U.S.C. § 841(b)(1)(A), any person with a prior felony drug conviction who is convicted of an offense involving five or more kilograms of cocaine "shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment...." Mays was sentenced to 20 years in prison pursuant to the mandatory minimum sentence required by 21 U.S.C. § 841(b)(1)(A). Mays argues that the issue of whether his offense involved five or more kilograms of cocaine should have been submitted to the jury. Since that issue was not submitted to the jury, Mays contends that the mandatory minimum sentence of 20 years under 21 U.S.C. § 841(b)(1)(A) should not have been applied in determining his sentence.
 
 
 41
 Mays' assertion is directly contradicted by Ninth Circuit decisions stating that drug quantity is not an element of the substantive offense under 21 U.S.C. § 841, but is rather "relevant to the penalty provisions of section 841(b), and is a matter for the district court at sentencing." United States v. Sotelo-Rivera, 931 F.2d 1317, 1319 (9th Cir.1991), cert. denied, 112 S.Ct. 1186 (1992); United States v. Egbuniwe, 969 F.2d 757, 763 (9th Cir.1992). Therefore, Mays' assertion that under 21 U.S.C. § 841 the issue of drug quantity must be submitted to the jury is without merit.
 
 
 42
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3
 
 
 [1]
 Although Pauley raised a number of sentencing issues on appeal, those issues have been rendered moot by the district court's recent reduction of Pauley's sentence
 
 
 [2]
 Randle was indicted on a number of charges in connection with this reverse sting operation. Randle pled guilty before trial
 
 
 [3]
 Mays argues that if this issue is deemed waived on appeal, his attorney rendered ineffective assistance of counsel. A claim of ineffective assistance of counsel is ordinarily raised in habeas proceedings where the factual questions can be resolved in an evidentiary hearing before the district court. United States v. Sanclemente-Bejarano, 861 F.2d 206, 211 (9th Cir.1988). A court may consider this issue on direct appeal "where 'the defendant's legal representation was so inadequate as obviously to deny him his sixth amendment right to counsel.' " United States v. Rewald, 889 F.2d 836, 859 (9th Cir.1989) (quoting United States v. Wagner, 834 F.2d 1474, 1482 (9th Cir.1987)), modified, 902 F.2d 18 (9th Cir.), cert. denied, 111 S.Ct. 64 (1990). Here, the trial attorney's performance was not obviously inadequate and we decline to address the ineffective assistance claim on direct appeal